Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/05/2020 08:08 AM CDT

In re Estate of Timothy J.
McConnell, deceased.
Susan Wengert, appellee, v. Theresa A. Rajendran,
Personal Representative of the Estate
of Timothy J. McConnell,
deceased, appellant.

___ N.W.2d ___

Filed May 5, 2020.    No. A-19-330.

1. **Decedents' Estates: Judgments: Appeal and Error.** In the absence of
an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. When
reviewing a judgment for errors appearing on the record, the inquiry is
whether the decision conforms to the law, is supported by competent
evidence, and is neither arbitrary, capricious, nor unreasonable.
2. **Decedents' Estates: Appeal and Error.** The probate court's factual
findings have the effect of a verdict and will not be set aside unless
clearly erroneous.
3. **Judgments: Appeal and Error.** When reviewing questions of law, an
appellate court has an obligation to resolve the questions independently
of the conclusion reached by the trial court.
4. **Abatement, Survival, and Revival: Wrongful Death.** A wrongful death action and a survival action are two distinct causes of
action which may be brought by a decedent's personal representative.
Although they are frequently joined in a single action, they are conceptually separate.
5. **Wrongful Death: Damages.** A wrongful death action is brought on
behalf of the widow or widower and next of kin for damages they have
sustained as a result of the decedent's death. Such damages include the
pecuniary value of the loss of the decedent's support, society, comfort,
and companionship.
6. ____: ____. A wrongful death plaintiff may only recover for a pecuniary
loss, meaning a loss which has a money value.

- 304 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

7. **Wrongful Death: Damages: Juries: Words and Phrases.** The word "pecuniary" is not to be construed in a strict sense; its exact measure and the task of determining such must be left to the good judgment and ordinary common sense of the jurors, based upon the circumstances of each case.

8. **Wrongful Death: Damages: Evidence: Juries.** There is no requirement in a wrongful death case that there be evidence of the dollar value of companionship, counseling, or advice, as that is a matter left to the sound discretion of the jury.

9. **Abatement, Survival, and Revival: Decedents' Estates.** An action under the survival statute, Neb. Rev. Stat. § 25-1401 (Reissue 2016), is the continuance of the decedent's own right of action which he or she possessed prior to his or her death. The survival action is brought on behalf of the decedent's estate and encompasses the decedent's claim for predeath pain and suffering, medical expenses, funeral and burial expenses, and any loss of earnings sustained by the decedent, from the time of the injury up until his or her death.

10. ____: ____. A survival action is personal to the decedent for damages suffered by the decedent between the wrongful act and his or her death and recovery for such damage belongs to the decedent's estate and is administered as an estate asset.

11. **Wrongful Death: Damages.** Damages for pain and suffering are intangible and quite subjective elements which are not a mere matter of computation.

12. **Damages.** The amount of damages is a matter solely for the fact finder.

13. **Wrongful Death.** The next of kin may recover in a wrongful death action only those losses sustained after the injured party's death by reason of being deprived of what the next of kin would have received from the injured party from the date of his or her death, had he or she lived out a full life expectancy.

14. **Antenuptial Agreements.** Premarital agreements are contracts made in contemplation of marriage.

15. **Contracts.** In interpreting contracts, the court as a matter of law must first determine whether the contract is ambiguous.

16. **Contracts: Words and Phrases.** An instrument is ambiguous if a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.

17. **Contracts: Intent.** If a contract is unambiguous, the intent of the parties must be determined from the contents of the contract.

18. **Contracts.** The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review.

- 305 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

19. **Wrongful Death: Decedents' Estates: Antenuptial Agreements: Waiver.** Proceeds from a wrongful death action are not the property of a decedent's estate and are therefore not contemplated as a property right waived in a premarital agreement unless the language of the premarital agreement specifically waives such right.
20. **Wrongful Death: Damages.** There is no exact fiscal formula for determination of damages recoverable for loss of society, comfort, and companionship, a loss which is not subject to some strict accounting method based on monetary contributions, past or prospective.
21. ____: ____. Damages for loss of companionship and society must be determined upon a consideration of the facts of each case.
22. **Parent and Child.** The relationship between parent and child has intrinsic value.

Appeal from the County Court for Douglas County: Stephanie R. Hansen, Judge. Reversed and remanded with directions.

Edward D. Hotz and Emily Dickson, Senior Certified Law Student, of Pansing, Hogan, Ernst & Bachman, L.L.P., and John S. Slowiaczek and Virginia A. Albers, of Slowiaczek Albers, P.C., L.L.O., for appellant.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellee.

Moore, Chief Judge, and Bishop and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

Theresa A. Rajendran, in her capacity as personal representative of the estate of Timothy J. McConnell (the estate), appeals from an order of the county court for Douglas County determining the allocation of settlement proceeds associated with McConnell's death in 2014 from mesothelioma at age 73. The proceeds derived from a court-approved stipulated settlement in a separate action in Missouri relating to McConnell's death. The county court determined there was a lack of competent evidence to support any apportionment under a survival claim and distributed the entirety of the proceeds pursuant to

- 306 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

a wrongful death claim. The county court allocated 90 percent of the proceeds to McConnell's estranged wife, Susan Wengert, and the remaining 10 percent to Rajendran (in her capacity as McConnell's daughter). We conclude that a portion of the proceeds should have been distributed to the estate pursuant to a survival claim for McConnell's pain and suffering before his death. Further, we find error in the allocation of the proceeds under the wrongful death claim. Therefore, we reverse the judgment of the county court and remand the cause with directions.

## II. BACKGROUND

### 1. Events During McConnell's Life

Wengert met and started dating McConnell in 1995. Both McConnell and Wengert had been previously married; McConnell had two children, Rajendran and another daughter who died in 2004, and Wengert had a son. On February 24, 1999, McConnell and Wengert executed a premarital agreement; they wed on February 27. At that time, McConnell was 58 years old and Wengert was 37 years old. They lived in Nebraska and had no children together. At the time of the evidentiary hearing, Rajendran, age 50, was married and had two children; she had lived in Colorado since 1995. Wengert worked in sales before and during the marriage; however, she resigned from her job in 2011, due to McConnell's illness, as described below. McConnell had been the chief executive officer and principal owner of a plastic manufacturing company. Wengert said she sometimes joined McConnell at business events and tried to help him solve work-related issues. McConnell continued to work for the company after his interest in it was sold.

McConnell was diagnosed with mesothelioma (in one or both lungs) in late 2010. According to Wengert, in January 2011, McConnell had surgery to "glue[] the lining of [his] lung to the lung" to prevent fluid buildup. McConnell was diagnosed with prostate cancer at the same time and treated for that

- 307 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

in 2011 and 2012. Rajendran's husband, an anesthesiologist of 20 years at the time of the evidentiary hearing, recalled that McConnell was "fairly asymptomatic" for the next 2 to 3 years after his mesothelioma diagnosis. Wengert said that McConnell relied on her to manage his medical appointments; in preparation for the evidentiary hearing, she made a list of the numerous medical appointments and procedures McConnell had from December 2010 to January 2014, and also noted commentary about McConnell's condition in another list she made about family events.

Both Wengert and Rajendran's husband indicated that McConnell's condition worsened in 2013. He experienced more pain and discomfort and developed abdominal pain. McConnell underwent surgery in October 2013; his gallbladder and appendix were removed. Wengert noted that McConnell went to the emergency room the day after surgery was completed due to anxiety and shortness of breath. Shortly after that, "complications from the surgery" led to the admission of McConnell to a hospital for 7 days. Rajendran's husband said that he and Rajendran went to visit McConnell during that time. He recalled that McConnell received a "nasogastric tube" to alleviate some discomfort, enable him to get up and walk, and allow his bowels to start functioning again. Rajendran's husband said that a pathology report showed that McConnell's appendix had signs of mesothelioma and that a surgeon deduced that either the mesothelioma in his abdomen was a new occurrence or the mesothelioma in his lungs had spread to his abdomen.

There were followup appointments. Chemotherapy was recommended. Rajendran's husband recalled "[t]hey" decided to try chemotherapy "but he was progressing pretty quickly," meaning he was becoming "more short of breath" and having "significantly more chest and abdominal pain" and was "fatigued." After his hospitalization in October 2013, he was on "some narcotics for pain management," an antianxiety medication, and a "blood thinner." McConnell ended up

- 308 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

having a "pulmonary embolism," which "added to the level of discomfort and difficulty breathing that he was experiencing, in addition to the physical chest pain that he was having"; he was placed on "additional blood thinners." He felt "slightly better" after that but "very soon" required supplemental oxygen. Wengert noted the last medical appointment she attended with McConnell was on January 22, 2014, "although there were more scheduled." Wengert said that in 2014, McConnell was "a little more tired" and "on more medication" than the year before; he was on "Hydrocodone" for pain relief, an anti-anxiety medication, and a blood thinner.

On March 17, 2014, McConnell filed for divorce in the Douglas County District Court. Among other things, he alleged that his marriage to Wengert was "irretrievably broken" with no remaining reasonable likelihood that it could be preserved; Wengert admitted the same in her answer, and in her "cross-complaint," she asserted that "efforts of the parties at reconciliation have wholly failed: further attempts at reconciliation would be fruitless and the marriage should be dissolved." On May 14, the district court entered a temporary order. At his request, McConnell was awarded exclusive possession of the marital home. Wengert was ordered to vacate the marital home by May 1; during the evidentiary hearing in the present action, Wengert said she moved out on that day. Upon Wengert's request, McConnell had to pay $5,000 per month in temporary alimony; those payments would be credited against the alimony owed under the premarital agreement, if the court found that agreement enforceable (Wengert disputed the enforceability of the agreement in the divorce action; in the present action, she concedes the agreement is valid).

Rajendran's husband said that in 2014, McConnell was "struggling to just walk around the house." He had "attempted some chemotherapy" about 3 or 4 weeks after his pulmonary embolism was being treated. He became "anemic" and had "several blood transfusions which added to the fact that

- 309 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

he was getting more fatigued and more short of breath." McConnell saw a therapist at some point to deal with the "mental aspects" of his condition. Rajendran said that from October 2013 through September 2014, she saw a deterioration in McConnell's mental and physical health. Rajendran's husband stated that within the last 3 to 4 weeks of McConnell's life, "it got pretty severe" and he was "no longer able to go up the stairs." Rajendran's husband said, "[H]e got so weak that he really needed assistance just getting out of [his] chair." McConnell had "home nurses and hospice nurses" caring for him at his home near the end of his life. In his last 10 days of life, McConnell was still on pain medications and was in a "very difficult pain management situation" due to having mesothelioma in his chest and abdomen. The "opioids" may have assisted chest pain but made abdominal pain worse, Rajendran's husband explained, "so he kind of endured through a lot of the suffering that you see with mesothelioma with a minimal amount of narcotics."

McConnell died from pulmonary mesothelioma on September 14, 2014. On September 24, the divorce action was dismissed.

## 2. Events Following McConnell's Death

Rajendran was appointed personal representative of the estate on September 22, 2014, as set forth in the "Registrar's Statement of Informal Probate" filed in the county court for Douglas County. In August 2016, she filed a lawsuit in that capacity against multiple defendants in a Missouri circuit court, alleging that McConnell's death was the result of contact with asbestos-containing products. Rajendran brought the action under the "Missouri Wrongful Death Statute, Mo[.] Rev. Stat. § 537.080 *et seq.*" and alleged that McConnell's mesothelioma was wrongfully caused and that, as a direct and proximate result of any or all of the defendants' wrongful acts and omissions, McConnell suffered and sustained the following injuries and damages:

- 310 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

(a) [McConnell] developed [m]esothelioma and suffered physical pain and mental distress;

(b) [McConnell] sought medical care and treatment for said injuries, and [Rajendran and/or McConnell] incurred expenses related to medical care and treatment . . . and funeral expenses;

(c) [McConnell] lost earnings and wages and [Rajendran] sustained the loss of [McConnell's] financial contribution and support;

(d) [McConnell] lost enjoyment of life;

(e) [Rajendran] incurred damages by reason of the death of [McConnell];

(f) [Rajendran] lost the services, consortium, companionship, comfort, instruction, guidance, counsel, training and support of [McConnell].

Damages and/or punitive damages were sought from each defendant.

On September 28, 2017, the Missouri circuit court entered a stipulated order approving a settlement and attorney fees and expenses owed to Rajendran's counsel. Counsel for Rajendran and counsel for Wengert, as an interested party, signed the order. The Missouri court made no finding on the distribution of funds between Rajendran and Wengert (both of whom the court concluded could receive funds under a wrongful death claim). The Missouri court ordered that all remaining settlement proceeds, about $2.3 million net after attorney fees and expenses, were to be paid to Rajendran as personal representative of the estate in the county court for Douglas County to be held "pending allocation of those proceeds pursuant to Nebraska law in the pending probate proceedings . . . involving the [e]state."

In February 2018, Wengert filed a "Motion to Require Accounting for Recovery in Wrongful Death Proceedings and for Determination of Distribution to Next of Kin" in the county court estate case. She requested the county court to approve the settlement from the Missouri action, hold an evidentiary

- 311 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

hearing, and distribute the "wrongful death recovery" net settlement proceeds, plus interest, "substantially" all to her and to Rajendran if appropriate. In March, as personal representative of the estate, Rajendran filed a motion for, among other things, (1) allocation of the settlement proceeds from the Missouri action first under the survival action to compensate McConnell for his "conscious pain and suffering" from having mesothelioma and (2) allocation of the remaining proceeds under the wrongful death claim to Rajendran and Wengert, asserting, in part, the amount of Wengert's pecuniary loss depended on the validity of the premarital agreement.

An evidentiary hearing took place on July 13, 2018; all exhibits offered were received. Wengert and five of her family members testified, and Rajendran and her husband testified.

### 3. County Court's Order

The county court issued its order on February 5, 2019. To apportion the settlement proceeds, the court questioned whether the proceeds flowed from both a survival and wrongful death claim or solely the latter. The county court found it was unclear whether a survival claim was contemplated in the Missouri action but concluded it could not apportion funds under a survival claim due to lack of "competent" evidence. The county court awarded Wengert "90 [percent] of the wrongful death proceeds" and Rajendran "10 [percent] of the wrongful death proceeds." No proceeds were allocated to a survival claim. On February 12, Rajendran, as personal representative, filed a motion to alter and amend the February 5 order, to reexamine the evidence, or to have a new "trial" because the order did not allocate any proceeds to the survival claim despite "sufficient and overwhelming evidence" to allow for allocation under such a claim. She further challenged the allocation of 90 percent of the wrongful death proceeds to Wengert when it was not supported by the evidence "given the pending divorce proceeding and the . . . [p]remarital [a]greement, and [Wengert's] testimony that she

- 312 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

felt that if . . . McConnell had lived the divorce would have become final." On March 27, following a hearing, that motion was denied.

In her capacity as personal representative of the estate, Rajendran filed a notice of appeal on April 3, 2019, from the county court's March 27 order, and an amended notice of appeal on April 5, from the county court's February 5 and March 27 orders.

### III. ASSIGNMENTS OF ERROR

Rajendran claims the county court erred in (1) failing to allocate any of the settlement proceeds to the estate under the survivor claim to compensate for McConnell's predeath pain and suffering, (2) allocating 90 percent of the settlement proceeds to Wengert when the prenuptial agreement between her and McConnell governed the extent of her pecuniary loss as a result of McConnell's death, and (3) determining Rajendran was only entitled to 10 percent of the settlement proceeds for the loss of McConnell's companionship, counseling, and advice.

### IV. STANDARD OF REVIEW

[1] In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. *In re Estate of Radford*, 304 Neb. 205, 933 N.W.2d 595 (2019). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

[2,3] The probate court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous. *Id.* When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *In re Estate of Panec*, 291 Neb. 46, 864 N.W.2d 219 (2015).

- 313 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

## V. ANALYSIS

### 1. General Legal Principles

[4] A wrongful death action and a survival action are two distinct causes of action which may be brought by a decedent's personal representative. *Id.* Although they are frequently joined in a single action, they are conceptually separate. *Id.*

[5-8] A wrongful death action is brought on behalf of the widow or widower and next of kin for damages they have sustained as a result of the decedent's death. *Id.* See, also, Neb. Rev. Stat. §§ 30-809 and 30-810 (Reissue 2016) (wrongful death statutes). Such damages include the pecuniary value of the loss of the decedent's support, society, comfort, and companionship. *In re Estate of Panec, supra.* A wrongful death plaintiff may only recover for a pecuniary loss, meaning a loss which has a money value. *Maloney v. Kaminski*, 220 Neb. 55, 368 N.W.2d 447 (1985). However, the word "pecuniary" is not to be construed in a strict sense; it is difficult to determine its exact measure and the task of determining such must be left to the good judgment and ordinary common sense of the jurors. See *id*. It must be determined upon a consideration of the circumstances of each case. *Id*. There is no requirement that there be evidence of the dollar value of companionship, counseling, or advice, as that is a matter left to the sound discretion of the jury. See *id*.

[9,10] In contrast, an action under our survival statute is the continuance of the decedent's own right of action which he or she possessed prior to his or her death. *In re Estate of Panec, supra*. See, also, Neb. Rev. Stat. § 25-1401 (Reissue 2016) (survival statute). The survival action is brought on behalf of the decedent's estate and encompasses the decedent's claim for predeath pain and suffering, medical expenses, funeral and burial expenses, and any loss of earnings sustained by the decedent, from the time of the injury up until his or her death. *In re Estate of Panec, supra*. A survival action is personal to the decedent for damages suffered by the decedent between the wrongful act and his or her death and recovery for such

- 314 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

damage belongs to the decedent's estate and is administered as an estate asset. See *id*.

The same individuals may stand to recover in both a wrongful death and survival action, as the decedent's next of kin may also be beneficiaries of a survival claim under the decedent's will or the laws of intestate succession. *Id*.

## 2. Survival Claim

Rajendran argues that McConnell's suffering far outweighs any pecuniary loss suffered by either Rajendran or Wengert and that McConnell's suffering deserves to be compensated under the survival claim. Rajendran contends the settlement proceeds should be divided according to the damage suffered, with "most" going to the survival claim. Brief for appellant at 19. Rajendran claims the county court erred when it did not allocate any settlement proceeds to the estate based on the survival claim. We agree.

### (a) Survival Claim Sufficiently Raised

We first address the dispute between Rajendran and Wengert as to whether a survival claim was asserted in the Missouri action and provided for under the stipulated order. Notably, the county court pointed out that it was "unclear" whether a survival action was contemplated in the petition filed in Missouri, because the "petition was filed by Rajendran as a daughter, not as the [personal representative] of the estate. There is no mention in the petition of the estate or Rajendran's position as the [personal representative] that allows her to step in and recover for the estate of McConnell." Having made that observation, the county court then stated, "However, the settlement order does make reference to Rajendran in both her beneficiary capacity and her fiduciary capacity as [personal representative], though it only refers to the proceeds of the settlement as wrongful death." The county court further noted that the settlement drew no distinction between wrongful death and pain and suffering. The county court then concluded: "No evidence was presented

- 315 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

to the court regarding McConnell's medical expenses, funeral and burial expenses, or loss of earnings. Based on the lack of competent evidence provided regarding the survival claim, the court cannot make a sound and reasonable apportionment of the funds recovered." Based on that conclusion, it is evident the county court proceeded to consider the survival claim as sufficiently raised, but determined the evidence to support apportionment on such a claim was lacking. We note that Wengert does not cross-appeal the county court's implicit conclusion that a survival claim was raised, but nevertheless argues that the Missouri action was only for wrongful death and failed to allege that it presented a survival action for McConnell's pain and suffering or any other claim accruing during his life.

We find no error in the county court's determination that a survival claim was sufficiently raised, as there was competent evidence to support it. As pointed out by Rajendran, her complaint in the Missouri action "alleged facts sufficient to give rise to a claim for [McConnell's] pain and suffering." Reply brief for appellant at 4. Although the complaint stated the action was being brought under Missouri's wrongful death statute, Missouri law became irrelevant when the stipulated order provided for allocation of the net settlement proceeds "pursuant to Nebraska law." Further, it is clear that the complaint in the Missouri action set forth wrongful death and survival claims. The complaint alleged, among other things, that "[a]s a direct and proximate result of the wrongful acts and omissions of Defendants, jointly and severally," McConnell suffered and sustained injuries and damages when he "developed [m]esothelioma and suffered physical pain and mental distress," sought treatment and care for said injuries, incurred medical and funeral expenses, and lost earnings, and that he further "lost enjoyment of life." Separate claims for damages for Rajendran personally included her loss of "services, consortium, companionship, comfort, instruction, guidance, counsel, training and support of [McConnell]." Multiple

- 316 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

defendants contributed to the total settlement award, and the checks for each defendant's share were written to Rajendran as the personal representative of McConnell's estate, not to Rajendran personally.

Thus, the record supports that a survival claim was raised in the Missouri action. See *In re Estate of Panec*, 291 Neb. 46, 864 N.W.2d 219 (2015), (complaint regarding decedent's fatal injuries which alleged decedent experienced pain and suffering and incurred medical expenses prior to decedent's death and which requested compensation under Nebraska law is sufficient evidence to show survival claim had been raised). Notably, pain and suffering and medical expenses are relevant only to a survival claim and are not recoverable in a wrongful death action. See *id.* The county court did not err in determining that a survival claim was raised within the Missouri action.

### (b) Survival Claim Portion of
### Settlement Proceeds

The remaining question is whether the county court erred by not allocating any of the settlement proceeds to the survival claim. As set forth above, the county court determined that there was no evidence regarding McConnell's medical expenses, funeral and burial expenses, or loss of earnings and that therefore, "[b]ased on the lack of competent evidence provided regarding the survival claim," it could not make a "sound and reasonable apportionment of the funds recovered." During the hearing on Rajendran's motion for new trial or to alter or amend, Rajendran's counsel said that Rajendran did not offer any evidence of "funeral expenses, and medical expenses, those kinds of things" because "they were, quite frankly, minimal." But Rajendran's counsel wanted an assessment of damages for "physical and emotional pain and suffering" (on appeal, Rajendran similarly only requests allocation to the estate for McConnell's pain and suffering). The county court said there was "definitely evidence presented that . . .

- 317 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

McConnell had — you know, he had a painful death, a painful, long death," but the court found it "very difficult" to figure out "what evidence" helped to quantify that.

[11,12] We find that the record contains sufficient evidence to support that McConnell suffered considerably for an extended period of time preceding his death and that therefore, the estate is entitled to a portion of the settlement proceeds under the survival claim for McConnell's pain and suffering. Although damages for pain and suffering may be difficult to compute, that cannot preclude entry of damages where they are appropriate as discernible by sufficient evidence. See, *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 629 N.W.2d 511 (2001) (damages for pain and suffering are intangible and quite subjective elements which are not mere matter of computation); *Nelson v. Dolan*, 230 Neb. 848, 434 N.W.2d 25 (1989) (jury could have awarded damages to decedent's estate for decedent's prefatal-injury mental anguish on finding that decedent apprehended and feared his impending death during 5 seconds that his motorcycle traveled 268 feet and locked with defendant's automobile before decedent was crushed and killed after motorcycle struck light pole and went under defendant's automobile). The amount of damages is a matter solely for the fact finder. See *Brandon v. County of Richardson*, 261 Neb. 636, 624 N.W.2d 604 (2001).

We conclude that the county court's failure to allocate a portion of the net settlement proceeds to the estate under the survival claim did not conform to the law and the evidence in the record. Therefore, we reverse the judgment of the county court and remand the cause with directions to allocate to the estate an appropriate amount of the settlement proceeds for the survival claim. As already acknowledged by the county court, there was "definitely evidence presented" that McConnell had "a painful, long death." Such evidence of McConnell's pain and suffering, and the numerous treatments and surgeries to which he was subjected, should be significant considerations when determining a correlating percentage of the

- 318 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

settlement proceeds to account for McConnell's predeath suffering when weighed against any pecuniary losses to Wengert and Rajendran, which we discuss next.

### 3. Wrongful Death Claim

After concluding that the pecuniary loss as a result of McConnell's death was significantly greater to Wengert than the pecuniary loss to Rajendran, the county court allocated 90 percent of the wrongful death proceeds to Wengert and the remaining 10 percent to Rajendran. Rajendran challenges those allocations.

[13] As stated previously, a wrongful death action is brought on behalf of the widow or widower and next of kin for damages they have sustained as a result of the decedent's death. *In re Estate of Panec*, 291 Neb. 46, 864 N.W.2d 219 (2015). Damages in a wrongful death action are to be "paid to and distributed among the widow or widower and next of kin in the proportion that the pecuniary loss suffered by each bears to the total pecuniary loss suffered by all such persons." § 30-810. Such damages include the pecuniary value of the loss of the decedent's support, society, comfort, and companionship. *In re Estate of Panec, supra.* The next of kin may recover in a wrongful death action only those losses sustained *after the injured party's death* by reason of being deprived of what the next of kin *would have received* from the injured party *from the date of his or her death*, had he or she lived out a full life expectancy. *Corona de Camargo v. Schon*, 278 Neb. 1045, 776 N.W.2d 1 (2009).

### (a) Allocation to Wengert as Widow of McConnell

In concluding that Wengert suffered a significantly greater pecuniary loss than Rajendran, the county court made findings about Wengert's employment history and how she benefited "greatly" from McConnell's work, noting a 2012 joint tax return that shows a "combined income in excess of $1 million." The county court found that the "lifestyle,

- 319 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

marital home, vacations, gifts, and expenses" were funded by McConnell's "substantial" income. It noted Wengert's testimony that she was McConnell's primary caregiver when he fell ill and that she went with him to his medical appointments. The county court also found Wengert was "caught off guard" when McConnell filed for divorce, lived in the marital home for "another few months" after that, and did not want a divorce.

The county court focused primarily on the loss of the financial lifestyle Wengert had enjoyed with McConnell during the marriage, and the court recognized that Wengert did not want the divorce to finalize. However, Wengert's pecuniary loss could only be evaluated based upon what she would have received from McConnell from the time of his death forward (had McConnell lived), and the evidence in this case indicates that McConnell and Wengert had no meaningful relationship at the time of McConnell's death. As we discuss further below, a divorce was pending, and a premarital agreement set forth McConnell's financial support obligations to Wengert in the event of divorce.

In March 2014, McConnell filed for divorce. Wengert's testimony and a temporary court order in the divorce action reflect that Wengert was ordered to and did vacate the marital home on May 1. She said that from that time until McConnell's death, she and McConnell continued to reside separately. Aside from in connection with the divorce action, she only saw him one time at his office to return a television remote control. In May, they had one telephone call during which Wengert said they were angry at one another, and at the end of July, Wengert had a telephone call with McConnell that prompted him to retitle a car to her. Although she did not prefer to get divorced and recalled more positive times during the marriage, Wengert admitted that it "seemed" that the divorce case had been headed in the direction of ending in a divorce. She even agreed that if McConnell had lived, it was more likely than not that the divorce would have been completed. Notably, Wengert

- 320 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

admitted in pleadings in the divorce action that the marriage was irretrievably broken.

Wengert can only recover in a wrongful death action for losses sustained after McConnell's death due to being deprived of what she would have received from McConnell *from the date of his death*, had McConnell lived out a full life expectancy. See *Corona de Camargo v. Schon, supra*. See, also, *Nelson v. Dolan*, 230 Neb. 848, 434 N.W.2d 25 (1989) (recovery for loss of services and companionship by surviving spouse can only be sustained where evidence shows reasonable probability that such services and companionship afforded survivor were of such character it would be of advantage to such survivor and that disallowance thereof would cause pecuniary loss to him or her); *Kenaston v. Teeters*, 190 Neb. 216, 207 N.W.2d 388 (1973) (general evidence of marital unfaithfulness of decedent that concerned state of marriage *prior to date of decedent's death*, was inadmissible in wrongful death action because previous misconduct was not relevant; wife and decedent husband were living together *at time of his death* and decedent was supporting his family).

The evidence upon which the county court relied to determine what portion of the wrongful death proceeds should be allocated to Wengert was focused more on Wengert's lifestyle during the marriage as opposed to the evidence related to the pending divorce and lack of a relationship at the time of McConnell's death. The record shows that Wengert had no meaningful relationship of any kind with McConnell at the time of his death. Any allocation to Wengert to compensate her for loss of McConnell's society, love, affection, care, attention, companionship, comfort, or protection was unreasonable and not in conformance with the law because Wengert no longer had a meaningful relationship with McConnell at the time of his death. See *Corona de Camargo v. Schon*, 278 Neb. 1045, 776 N.W.2d 1 (2009). Therefore, we agree with Rajendran that the "only loss" to Wengert was the loss of McConnell's financial support. Reply brief for appellant at 9.

- 321 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

Regarding Wengert's loss of financial support from McConnell, Rajendran claims such support was "contractually bargained" for in the premarital agreement. *Id*. Rajendran contends that Wengert's recovery is limited to what she would have received under the premarital agreement if the divorce had been finalized. But Wengert asserts that the premarital agreement, though valid, "has nothing to do with wrongful death proceeds." Brief for appellee at 8. During the hearing on Rajendran's motion to alter or amend, the county court said it did not consider the premarital agreement as part of its decision.

In Nebraska, no case law specifically addresses whether, or to what extent, a premarital agreement affects the entitlement of a decedent's widow or widower to wrongful death proceeds arising from the decedent's death. We therefore initially consider legal principles relevant to premarital agreements, and we then consider how courts of other states have addressed this issue.

[14] Premarital agreements are contracts made in contemplation of marriage. See *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012). Parties to a premarital agreement may contract with respect to several matters, including any matter "not in violation of public policy or a statute imposing a criminal penalty." Neb. Rev. Stat. § 42-1004 (Reissue 2016). The parties do not dispute the validity of the premarital agreement here. See Neb. Rev. Stat. § 42-1006 (Reissue 2016) (enforceability of premarital agreements). Because premarital agreements are contracts, basic contract principles are applicable to our understanding of the premarital agreement in the present case. See *Edwards v. Edwards*, 16 Neb. App. 297, 744 N.W.2d 243 (2008) (rejecting party's interpretation of premarital agreement; case law provides that contract provisions may be severable and plain language of premarital agreement refuted party's interpretation).

[15-18] In interpreting contracts, the court as a matter of law must first determine whether the contract is ambiguous.

- 322 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

*Wintroub v. Nationstar Mortgage*, 303 Neb. 15, 927 N.W.2d 19 (2019). An instrument is ambiguous if a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id.* If a contract is unambiguous, the intent of the parties must be determined from the contents of the contract. *Id.* The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review. *Id.*

When considering cases from other states, we came across an instance where the plain language of relevant statutes was controlling. In *Steele v. Steele*, 623 So. 2d 1140, 1142 (Ala. 1993), the Alabama Supreme Court held that an "antenuptial property agreement" had no effect on any proceeds that could be awarded in a separate wrongful death action. The Alabama court found that the plain language of its "Wrongful Death Act and the applicable statute of distribution" mandated that the surviving spouse in that case receive one-half of the proceeds of a wrongful death action if any were awarded. *Steele v. Steele*, 623 So. 2d at 1142. There was no room for judicial statutory construction of those statutes because the wording within the statutes was distinct and unequivocal. Also, the Alabama court noted that in signing the antenuptial property agreement, each party (widow and decedent husband) agreed to dispose of his or her own property but that it was "clear from the agreement that neither party contemplated a wrongful death action when they signed the agreement, as wrongful death proceeds are neither part of the decedent's estate nor a property right." *Id.* The opinion did not quote any language from the antenuptial property agreement.

Other courts have found that a premarital agreement had no bearing on a spouse's right to wrongful death proceeds when the language of the particular agreement was too narrow to encompass a waiver of that right. *In re Estate of Burns*, 31 So. 3d 1227 (Miss. App. 2009), involved a trial court's finding that a spouse had not waived his claim to wrongful death settlement proceeds relative to his wife's death despite their

- 323 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

undisputedly valid antenuptial agreement. The antenuptial agreement had the following provision:

> "Each of the parties hereto agree that on the death of the other, the surviving party will not have and will not in any way assert any claim, interest, estate or title of any kind or nature whatsoever in or to any property, real, personal, or mixed, of which the other party may die seized and possessed . . . ."

*Id.* at 1230. The Mississippi Court of Appeals noted that its wrongful death statute must be strictly construed and that a wrongful death action is not part of the estate of the deceased so that a wrongful death action itself does not enter the estate. The Mississippi court concluded that the antenuptial agreement had no bearing on the wrongful death claim or on the distribution of proceeds received from settling that claim. In so holding, the appellate court necessarily found that the plain language of the antenuptial agreement quoted above had no bearing on the distribution of wrongful death proceeds because those proceeds were not "'seized and possessed'" by the decedent wife during her life and, thus, did not pass through her estate upon her death. *In re Estate of Burns*, 31 So. 3d at 1230.

A similar result was reached in *In re Estate of Sorenson-Peters*, No. 11-1547, 2012 WL 5355712 (Iowa App. Oct. 31, 2012) (unpublished opinion listed in table of "Decisions Without Published Opinions" at 824 N.W.2d 561 (2012)), in which a decedent and her husband widower had signed a prenuptial agreement, "disclaiming any interest or right in the decedent's family's business." *Id.* at *3. In apportioning wrongful death proceeds, the trial court found that the objective facts clearly established that the decedent did not choose to limit any economic rights of the husband widower except the rights to the family business as outlined in the prenuptial agreement. A sum of the wrongful death proceeds was awarded to the husband widower. The Iowa court affirmed the apportionment, which it found to be equitable. See, also, *Kubian v.*

- 324 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

*Alexian Bros. Medical Center*, 272 Ill. App. 3d 246, 253, 651 N.E.2d 231, 236, 209 Ill. Dec. 303, 308 (1995) (antenuptial agreement statement that widow would not make claim as to "'any part of *her spouse's estate*'" did not waive widow's right to pursue common-law loss of consortium claim; loss of consortium was not listed among rights waived in the antenuptial agreement, and such claim belonged to surviving spouse, not decedent).

Broad language in a postnuptial agreement produced a different result in *Rickman v. Rickman*, No. M2013-00251-COA-R3-CV, 2013 WL 5656214 (Tenn. App. Oct. 15, 2013). In that case, a widow appealed a trial court's ruling that she could not benefit from a wrongful death settlement related to her deceased husband's death given a postnuptial agreement executed during their marriage. The Tennessee court concluded that it was bound by the plain language of the postnuptial agreement, which waived the widow's right to share in the wrongful death proceeds. To reach that conclusion, the appellate court first noted that antenuptial and postnuptial agreements are both interpreted and enforced as any other contract. There was no dispute that the postnuptial agreement at issue was valid, and therefore, it could be interpreted according to general contract principles and the notion that such agreements are to be construed liberally to give effect to the intention of the parties. The court recognized that in Tennessee, the proceeds from a wrongful death action are not property of the decedent's estate but instead pass outside the estate through the operation of the state's intestacy statutes.

On appeal, the widow in *Rickman v. Rickman, supra*, relied on *Steele v. Steele*, 623 So. 2d 1140 (Ala. 1993), and *In re Estate of Burns*, 31 So. 3d 1227 (Miss. App. 2009), the cases discussed above, as supportive of her position. However, the Tennessee court found those cases to be distinguishable. As relevant here, the court noted that it was unable to unequivocally conclude that wrongful death proceeds were not contemplated when the widow and decedent entered into the postnuptial

- 325 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

agreement, unlike in *Steele v. Steele, supra*. That court understood the antenuptial property agreement in *Steele v. Steele, supra*, to have contemplated only the decedent's estate or property rights. Plus, the court noted that the agreement in *In re Estate of Burns*, 31 So. 3d at 1230, applied only to property "'of which the other party may die seized and possessed.'" But the contract in *Rickman v. Rickman, supra*, was far broader. In addition to mutual waivers of rights to the property of the other spouse, there was a mutual waiver of "'all other rights which they may have acquired by reason of their marriage.'" *Id*. at *1. The court found there could be no dispute that the widow's right to receive the wrongful death proceeds, if any, was a right acquired by reason of her marriage to the decedent. Therefore, the agreement was broad enough to encompass proceeds flowing from a wrongful death action.

[19] Nebraska's wrongful death statutes provide a widow or widower and next of kin a right of action for damages sustained as a result of a decedent's death. See *In re Estate of Panec*, 291 Neb. 46, 864 N.W.2d 219 (2015). Such damages are for only those losses sustained after the injured party's death by reason of being deprived of what the widow or widower and next of kin would have received from the injured party from the date of his or her death, had he or she lived out a full life expectancy. See *Corona de Camargo v. Schon*, 278 Neb. 1045, 776 N.W.2d 1 (2009). Accordingly, we agree with the reasoning of other states that proceeds from a wrongful death action are not the property of a decedent's estate and are therefore not contemplated as a property right waived in a premarital agreement unless the language of the premarital agreement specifically waives such right. We now turn to the language of the premarital agreement at issue here.

The contractual terms in the present case are not as broadly stated as those contained in *Rickman v. Rickman*, No. M2013-00251-COA-R3-CV, 2013 WL 5656214 (Tenn. App. Oct. 15, 2013). McConnell and Wengert's premarital agreement stated, in relevant part:

- 326 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

1. For all purposes of this Agreement, the property made subject to this Agreement shall consist of all right, title or interest, present or future, legal or equitable, vested or contingent, in real or personal property that either party has or might hereafter inherit or receive through estates or trusts created by relatives or as gifts from relatives, together with the property described in Exhibits "A" and "B" which are attached hereto and incorporated herein by reference, including any income, earnings, proceeds, benefits, distributions or other value flowing from or received due to the ownership of such property interests, such as may be received in, but not limited to, the following forms: wages, compensation, salary, rents, dividends, distributions, interest, liquidation distributions, sale proceeds, exchanges of property or money, any other payments, changes in form or appreciation in value of such property interests. As used hereinafter in this Agreement, all such property made subject to this Agreement shall be referred to as "*Separate Property*." . . .

. . . .

5. It is agreed that [Wengert] shall not acquire or become vested with any interest or right whatsoever in and to the *Separate Property* of [McConnell], during his lifetime or upon his death, in the same manner as if said contemplated marriage had not occurred. . . .

. . . .

9. [Wengert] agrees that upon the death of [McConnell], if she shall survive him, she shall receive nothing from the *Separate Property* of [McConnell]. [Wengert] does hereby waive, relinquish and disavow all rights, claims and interest in law or in equity and all statutory rights and allowances which she might have or could have in the *Separate Property* of [McConnell] *which is included in the estate of* [*McConnell*] *or any part thereof*, now owned or after acquired . . . .

10. In the event of a separation, divorce, marital dissolution or annulment, [McConnell] shall make no

- 327 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

provisions for [Wengert] *with respect to the Separate Property* of [McConnell], and [Wengert] does waive any rights as spouse that she may have in the Separate Property of [McConnell] as herein defined. However, [*Wengert*] *does not waive any rights as spouse that she may have in property other than the Separate Property of* [*McConnell*] . . . .

(Emphasis supplied.) As set forth above in the premarital agreement at paragraph 1, the definition of "Separate Property" does not purport to include wrongful death proceeds. And in paragraph 10, it states that Wengert "does not waive any rights as spouse that she may have in property other than the Separate Property of [McConnell]."

The language of the premarital agreement is unambiguous. Although Wengert waived rights that she may have had by virtue of her status as McConnell's spouse "as if said contemplated marriage had not occurred," the waiver was only and specifically in regard to those assets defined as McConnell's "Separate Property." The waivers to which Wengert agreed are unlike the broad waiver in *Rickman v. Rickman*, No. M2013-00251-COA-R3-CV, 2013 WL 5656214 at *1 (Tenn. App. Oct. 15, 2013), of "*all other rights* which [the parties to the agreement] may have acquired by reason of their marriage." (Emphasis supplied.) Rather, the language of the waivers here are akin to the narrow language of premarital agreements in the other appellate cases that did not specifically preclude recovery of wrongful death proceeds by a spouse of a decedent. See *In re Estate of Sorenson-Peters*, No. 11-1547, 2012 WL 5355712 at *3 (Iowa App. Oct. 31, 2012) (unpublished opinion listed in table of "Decisions Without Published Opinions" at 824 N.W.2d 561 (2012)) (no economic rights of widower limited under prenuptial agreement except "any interest or right in the decedent's family's business"), and *In re Estate of Burns*, 31 So. 3d 1227, 1230 (Miss. App. 2009) (antenuptial agreement applied to property "of which the other party may die seized and possessed").

- 328 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

We conclude the premarital agreement does not itself bar Wengert from recovery of some portion of the wrongful death settlement proceeds. However, given the circumstances of this case, the premarital agreement nevertheless has relevance to determining Wengert's pecuniary loss. As previously stated, wrongful death damages include the pecuniary value of the loss of the decedent's support, society, comfort, and companionship. See *In re Estate of Panec*, 291 Neb. 46, 864 N.W.2d 219 (2015). And as previously determined, any allocation to Wengert to compensate her for the loss of McConnell's society, love, affection, care, attention, companionship, comfort, or protection was unreasonable and not in conformance with the law, because she no longer had a meaningful relationship with McConnell at the time of his death.

Therefore, Wengert's pecuniary damages are limited to the loss of McConnell's financial support based on what she would have received from McConnell from the date of his death, had he lived out a full life expectancy. See *Corona de Camargo v. Schon*, 278 Neb. 1045, 776 N.W.2d 1 (2009). The record does not show that McConnell and Wengert had plans at the time of his death to return to the shared financial lifestyle they had in place prior to when Wengert moved out of the marital home. Wengert pled in the divorce action that her marriage to McConnell was irretrievably broken, and she admitted in the present matter that the divorce action would most likely have ended in a divorce. The premarital agreement reflects what amount of financial support Wengert could have reasonably expected to receive from McConnell from the date of his death, had he lived out a full life expectancy.

The premarital agreement shows that in the event of the death of McConnell, or upon the filing of a complaint for separation or divorce (at McConnell's option), Wengert would be entitled to $300,000 of proceeds from a life insurance policy; Wengert admitted receiving the proceeds from the $300,000 policy, plus a smaller policy. The premarital agreement provides that in the event of a divorce, McConnell was to pay Wengert "alimony and support" in the amount of $33,333 per

- 329 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

year, payable in equal monthly installments, for a period of 3 years subject to immediate termination in the event of the death or remarriage of Wengert. A temporary order from the divorce action stated that McConnell would receive a credit for alimony owed under the premarital agreement for any amount of temporary alimony that he paid. The docket from that action (received in evidence here) shows that McConnell paid Wengert $20,000 in temporary alimony by the time of his death, thus leaving $79,999 in alimony still owed ($99,999 − $20,000) had he lived out a full life expectancy. The record does not show that McConnell was financially supporting Wengert at the time of his death beyond fulfilling his temporary alimony obligation.

We therefore conclude that the county court erred by not considering the premarital agreement at all and by focusing instead on the financial lifestyle Wengert had enjoyed during the marriage rather than on what Wengert could have reasonably expected to receive from McConnell had he lived out his full life expectancy. Given their pending divorce, their separation, and the lack of any meaningful relationship between McConnell and Wengert by the time of McConnell's death, consideration must be given to what Wengert could have reasonably expected to receive under those circumstances. On remand, the county court should reapportion any wrongful death settlement proceeds, taking these factors into consideration, and should consider only what Wengert could have reasonably expected to receive in terms of financial support from the time of McConnell's death going forward, had he lived. The premarital agreement, while not controlling, is nevertheless relevant to this determination.

### (b) Allocation to Rajendran as
### Daughter of McConnell

The county court recognized that Rajendran lived in Colorado with her husband and child and that there was no testimony that she relied on McConnell for "any sort of financial support." However, Rajendran received 10 percent of the proceeds

- 330 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

because she did "suffer the loss of gifts and other tokens of affection common between parent and child."

Like Wengert, Rajendran can only recover in a wrongful death action for losses sustained after McConnell's death due to being deprived of what she would have received from McConnell from the date of his death, had he lived out a full life expectancy. See *Corona de Camargo v. Schon*, 278 Neb. 1045, 776 N.W.2d 1 (2009). On appeal, Rajendran concedes that she did not rely on McConnell for financial support but argues she relied on him for "companionship, counseling, and advice, particularly in her business." Brief for appellant at 18. Rajendran argues that "[t]his pecuniary loss is in addition to [her] 'loss of gifts and other tokens of affection common between parent and child.'" *Id.* at 19 (quoting county court's order).

[20-22] There is no exact fiscal formula for determination of damages recoverable for loss of society, comfort, and companionship, a loss which is not subject to some strict accounting method based on monetary contributions, past or prospective. *Brandon v. County of Richardson*, 261 Neb. 636, 624 N.W.2d 604 (2001). Because it is impossible to generalize the extent to which persons enjoy each other's companionship and society, the value of such highly personal relationships must be decided on a case-by-case basis. *Id.* A parent-child relationship has intrinsic value, even if that relationship is less than perfect. See *id.* (wrongful death action concerning child decedent; once existence of parent-child relationship is proved, then evidence about quality and extent of that relationship may be utilized to determine amount of surviving parent's damages). See, also, *In re Estate of Brown-Elliott*, 27 Neb. App. 196, 203, 930 N.W.2d 51, 57 (2019) (in dividing wrongful death settlement proceeds, "time is not the sole measure of a parent-child relationship" but evidence of whether relationship of parent and minor child decedent included "'any semblance of normal parental love and affection'" was also considered to determine damages sustained by parent).

- 331 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE ESTATE OF McCONNELL
Cite as 28 Neb. App. 303

The record contained ample evidence regarding Rajendran's relationship with McConnell. Rajendran testified about her "very close" relationship with McConnell up until the time of his death. Rajendran had owned a company and had often talked to McConnell about her business. She talked to him weekly as she was growing her company to determine how to solve "different challenges." There was testimony from Wengert, as well as Rajendran and her husband, which indicated that during McConnell and Wengert's marriage, McConnell traveled to visit Rajendran (and vice versa) a fair number of times given their residence in different states. Rajendran agreed that her involvement with McConnell and his health increased after he asked her to come to the hospital in October 2013. She grew "much, much closer" to McConnell during that time. From that time until his death, Rajendran and her husband would go with McConnell to his medical appointments. Eventually, there was agreement that Rajendran would spend half the week in Omaha with McConnell and half the week at home in Colorado. They executed that arrangement "for several months."

There is no indication that the county court fully considered the value of the pecuniary loss to Rajendran from the loss of McConnell's companionship, counseling, and advice. On remand, Rajendran is entitled to an amount of the settlement proceeds under the wrongful death claim in view of evidence in the record of her loss of McConnell's companionship, counseling, and advice in addition to her "loss of gifts and other tokens of affection common between parent and child."

## VI. CONCLUSION

For the foregoing reasons, we reverse the judgment of the county court and remand the cause on the record already made with directions to the county court to allocate the settlement proceeds between the survival claim and the wrongful death claim as set forth above.

Reversed and remanded with directions.