JAMES MALONEY, PERSONAL REPRESENTATIVE OF THE ESTATE OF FRANK T. MALONEY, DECEASED, APPELLEE, V. ROBERT L. KAMINSKI, APPELLEE, AND CONSOLIDATED FREIGHTWAYS CORPORATION, APPELLANT.

368 N.W.2d 447

Filed May 24, 1985.    No. 84-300.

Steven G. Seglin of Crosby, Guenzel, Davis, Kessner & Kuester, for appellant.

Gary J. Nedved of Marti, Dalton, Bruckner, O'Gara & Keating, P.C., for appellee Maloney.

KRIVOSHA, C.J., CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

CAPORALE, J.

Decedent, Frank T. Maloney, died as the result of injuries he sustained in a multivehicle accident occurring in the two eastbound lanes of Interstate 80 near Milford, Nebraska, at approximately 8 p.m. on April 7, 1982. As a consequence, James Maloney, decedent's personal representative, the plaintiff-appellee, brought an action against Robert L. Kaminski, the driver of one of the other automobiles involved, and Consolidated Freightways Corporation, the defendant-appellant, whose semitrailer tractor was also involved. Kaminski then brought a third-party action against the estate of Leah Jones, the driver of the automobile in which the decedent was a passenger. A trial by jury was had, wherein the trial court sustained Kaminski's motion for a directed verdict on plaintiff's petition and dismissed Kaminski's third-party action against Jones. The trial court then entered judgment in the sum of $92,500 in favor of plaintiff against Consolidated Freightways, adjusting the jury's verdict of $105,000 by subtracting therefrom the $12,500 plaintiff had received in settlement from the Jones estate. In this appeal Consolidated Freightways assigns five errors: (1) The trial court's failure to find there was insufficient evidence to submit the issue of negligence to the jury; (2) The trial court's failure to find there was insufficient evidence to submit the issue of proximate cause to the jury; (3) The trial court's refusal to give Consolidated Freightways' requested instructions on the act of God defense and the unavoidable accident and sudden emergency doctrines; (4) The trial court's giving of an instruction on the range of vision rule; and (5) The claimed excessiveness of the jury's verdict. We affirm.

## FACTS

The events leading to the accident began when Kaminski drove his automobile east at 55 miles per hour onto a bridge, at the location described previously, and the driver of an

automobile traveling five or six car lengths in front of Kaminski applied his brakes in order to turn into a rest area. Kaminski, noticing that the automobile ahead of him fishtailed when its brakes were applied, tapped his brakes. As a result, Kaminski's automobile began swerving out of control. The automobile driven by Jones at a rate less than the legal speed limit struck the Kaminski automobile when the latter was at an angle facing southeast and blocking both lanes of traffic on the bridge. This collision, according to Kaminski, the state trooper who investigated the accident, and the two surviving Jones passengers, took place in the right, or southernmost, lane.

The Consolidated Freightways truck then struck the Jones automobile. The state trooper and the two surviving Jones passengers testified that the collision between the Jones automobile and truck also occurred in the right lane near the south guardrail where the Jones automobile had come to rest.

Luciano Lucero, the driver of the Consolidated Freightways truck, testified that he was traveling at 45 miles per hour. When he first saw the Kaminski and Jones automobiles, he was approximately 110 feet from them, and they were in the left, or northernmost, lane. He attempted to stop but found that because of his speed and the condition of the roadway, he could not bring the truck to a stop before colliding with one or both of the automobiles. He therefore decided to go around them on the right. The Kaminski and Jones automobiles suddenly moved sideways into the right lane, at which time he was approximately a truck length to 55 feet from them. Lucero then drove the truck into the left lane, but the Jones automobile suddenly moved back into that lane and the collision between those two vehicles occurred.

The passenger sitting in the front seat of the Jones automobile, one of the two surviving passengers, testified that once the Kaminski automobile was hit, the Jones automobile was hit in the rear "almost instantaneously" by the truck. The back seat passenger testified that after the first collision the Jones automobile came to a stop, whereupon she looked over her shoulder and saw the truck, which was right upon them. The collision with the truck, in her words, occurred "very fast."

A third collision, not involving the truck or the Jones

automobile, occurred between the Kaminski automobile and an automobile driven by one Macfie, wherein the Kaminski and Macfie automobiles came to rest 313 feet west of the point where the truck came to rest. (This collision is the subject of *Macfie v. Kaminski*, 219 Neb. 524, 364 N.W.2d 31 (1985), in which the trial court's dismissal of the action brought against Kaminski by the passenger in the Macfie automobile was affirmed.)

The state trooper made numerous measurements and calculations during his investigation of the accident. He testified that the bridge, located a mile west of the Milford interchange, is approximately 380 feet long and crosses the Blue River. The width of the bridge totaled 30 feet from abutment to abutment, whereas the width of the traveled portion of the roadway off the bridge was 24 feet, with a 10-foot shoulder on the right, or south, side and a 3-foot shoulder on the left, or north, side.

The trooper determined that the point of impact between the Kaminski and Jones automobiles occurred 122 feet west of the east end of the bridge and 3 feet north of the right, or south, guardrail. Debris and a trail of diesel fuel from the place at which the truck's diesel tanks burst enabled the trooper to determine that the point of impact between the truck and the Jones automobile occurred 101 feet west of the east end of the bridge and 4 feet north of the right guardrail, or 21 feet east of where the Jones-Kaminski collision occurred. After the collision the Jones automobile and the truck remained in contact with each other. The left front of the truck stopped 240 feet east of the east end of the bridge, and the left front of the Jones car was 6 feet further east, with the car wedged between the truck and the guardrail.

The trooper also testified about the terrain west of the eastbound bridge, or, in other words, the terrain over which the automobiles and truck would have passed before entering the bridge where the collisions occurred. His testimony was that traffic would go down a slight incline, and then just prior to entering the bridge, traffic would "kind of go up another slight incline." According to the trooper, the roadway approaching the bridge is straight, and there is nothing to obscure a driver's

vision. Lucero's testimony was that the terrain "goes down, then kind of levels up and then kind of a little rise" before entering the bridge. According to Lucero, the Kaminski and Jones automobiles had no lights when they were on the bridge, and he did not see them until he "leveled off on the bridge . . . when the lights hit them." Lucero had his own lights on dim, in accordance with Consolidated Freightways' policy.

The condition of the roadway is in dispute. The trooper testified that it was around 28 to 30 degrees the evening of the accident, and sleet, or frozen water, was falling. Kaminski also testified that it was raining, misting, and sleeting when he left Grand Island. After receiving the accident report the trooper left Seward and drove to the accident scene. He stated it took longer than usual for him to get there "[b]ecause the road conditions were icy and very, very slick." There was "very little difference, if any," between the condition of the roadway and that of any bridges he passed over.

Lucero's testimony was that it started raining or misting when he drove by Grand Island at approximately 6 p.m. He did not notice any sleet, but the road was wet. Lucero was not aware of the temperature, but he did realize it was getting colder. He was "afraid" that it would ice up somewhere along the road, especially on the bridges, so he slowed his truck in stages from 55 to 45 miles per hour. There is also a sign posted just before entering the bridge, warning that it might be icy. Lucero noticed no ice when the truck crossed a railroad overpass a quarter to a third of a mile before reaching the bridge. However, in anticipation of the roadway becoming slick, Lucero had made some valve adjustments so as to put more weight on the truck's drive axle before he entered the bridge on which the accident occurred. This was done so he would have more traction.

The passenger in the front seat of the Jones automobile testified that as they approached the bridge, the road began to get slick and Jones slowed down. Everyone agrees that the bridge was icy at the time of the collisions.

As a result of the accident, decedent was pinned between the front and rear seats. He remained conscious at the scene and told one of the other passengers that his legs hurt and that he

was cold. There was blood in his eyes and around his head. He was also conscious and in pain when brought to Lincoln General Hospital at 12:35 a.m. on April 8, the day after the accident, after being stabilized at the Seward hospital. Around noon on April 9, decedent lost consciousness and remained so until he died on April 28, after the life support system had been disconnected on the previous day.

The evidence establishes that no one in the Jones automobile was injured until that automobile was struck by the truck and that decedent died as a result of the injuries sustained in that collision.

Decedent was 72 years old at the time of his death and had a life expectancy of 9.15 years. His widow's life expectancy is somewhat longer. The decedent and his widow had been married for 41 years and had raised a family of six children, including a retarded son who lived with his parents and requires the same care as an infant. The decedent had been employed in a grocery store and later as a custodian for the University of Nebraska. He retired at age 63, evidently in 1973.

The evidence portrays the decedent and his widow as devoted to each other and demonstrates that their lives revolved around their family and home. During their retirement, they had taken several trips together and planned more in the future.

Decedent received Social Security benefits in the amount of $388 per month. While decedent was living, the widow received $220 per month in Social Security benefits. After decedent's death her Social Security benefits increased to the amount decedent had been receiving. The retarded son also receives Social Security benefits, which increased in amount following decedent's death. The amount of that increase is not reflected by the record. Decedent had contributed $200 to $300 a month toward the family's living expenses.

Decedent's medical bills totaled $42,145.68, and his funeral expenses totaled $3,579.64. Of the $105,000 verdict, then, $45,725.32 is accounted for by direct out-of-pocket expenses, leaving $59,274.68 as compensation for all other losses.

## NEGLIGENCE

Plaintiff alleges Consolidated Freightways was negligent in failing to keep a proper lookout, in failing to keep its vehicle

under reasonable control, and in driving at an excessive rate of speed in view of the existing conditions.

In its first assignment of error Consolidated Freightways asserts there was insufficient evidence of negligence on its part to submit the case to the jury, and, therefore, its motion for a directed verdict should have been sustained on that ground.

We begin by reviewing the rules applicable to the resolution of this issue.

On a motion for a directed verdict, the moving party is deemed to have admitted as true all the material and relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences which can reasonably be deduced therefrom. *Farm Bureau Life Ins. Co. v. Luebbe*, 218 Neb. 694, 358 N.W.2d 754 (1984); *Eden v. Spaulding*, 218 Neb. 799, 359 N.W.2d 758 (1984); *Jershin v. Becker*, 217 Neb. 645, 351 N.W.2d 48 (1984); *Five Points Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 677, 350 N.W.2d 549 (1984). Further, in determining the sufficiency of the evidence to sustain a verdict, the evidence must be considered most favorably to the successful party, every controverted fact must be resolved in his favor, and he is entitled to the benefit of any inferences reasonably deducible from it. A jury's verdict will not be disturbed unless it is clearly wrong. *Farm Bureau Life Ins. Co. v. Luebbe, supra; Steinauer v. Sarpy County*, 217 Neb. 830, 353 N.W.2d 715 (1984).

It is also clear, however, that the plaintiff has the burden of proving the defendant was negligent, and merely establishing that an accident happened does not prove negligence. *Macfie v. Kaminski*, 219 Neb. 524, 364 N.W.2d 31 (1985).

Consolidated Freightways argues the evidence shows its driver, Lucero, was maintaining a proper lookout and had his truck under reasonable control. Ordinarily, issues regarding lookout and control are to be determined by the jury. *Sacco v. Gau*, 188 Neb. 808, 199 N.W.2d 605 (1972). We find nothing in the record to take this case out of that general rule.

Lucero testified he did not see the Kaminski and Jones vehicles until he was only 110 feet away. He was then unable to stop before colliding with the Jones automobile. Lucero's

explanation was that because there was a "kind of a little rise" before entering the bridge, his headlights did not pick up the automobiles until that time. The state trooper described the same terrain as a "slight incline." However stated, there is nothing in the description of the terrain to prevent the jury from finding that there was no obstruction to Lucero's view and that he should have seen what was taking place ahead of him before he actually did so.

In addition to the question of whether the terrain made it impossible for Lucero to see, as he claimed, his version of the accident did not comport with that of the other eyewitnesses, and did not match the testimony of the state trooper, who relied on physical evidence in determining where the accident had occurred.

The credibility of a witness and the weight to be given to his testimony are issues for the jury to resolve. *Hancock v. Paccar, Inc.*, 204 Neb. 468, 283 N.W.2d 25 (1979); *Wisnieski v. Harms*, 188 Neb. 721, 199 N.W.2d 405 (1972). A jury is not required to accept as absolutely true every statement of a witness, even though such is not contradicted by direct evidence. The persuasiveness of uncontradicted testimony can be destroyed in other ways. *Batterman v. Richardson*, 189 Neb. 303, 202 N.W.2d 613 (1972); *Schmeeckle v. Peterson*, 178 Neb. 476, 134 N.W.2d 37 (1965).

The evidence supports a finding both that Lucero was not maintaining a proper lookout and that he did not have the truck under reasonable control by virtue of his speed. Such being the case, the issue of Consolidated Freightways' negligence was for the jury to determine.

## PROXIMATE CAUSE

Consolidated Freightways next urges that Lucero's negligence was not the proximate cause of decedent's death, but, rather, the negligence of Kaminski and Jones was such cause.

Proximate causation is generally a question for the jury, and only where but one inference can be drawn is it proper for the court to decide the issue. *Shelton v. Board of Regents*, 211 Neb. 820, 320 N.W.2d 748 (1982); *Libbey-Owens Ford Glass Co. v. L & M Paper Co.*, 189 Neb. 792, 205 N.W.2d 523 (1973).

Our cases have consistently defined proximate cause as that cause which, in a natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the injury would not have occurred. *Corbet, Inc. v. County of Pawnee,* 219 Neb. 622, 365 N.W.2d 437 (1985); *Shelton v. Board of Regents, supra,* quoting *Weichel v. Lojka,* 185 Neb. 819, 179 N.W.2d 112 (1970).

There are three elements to proximate causation, the first being a factual cause, commonly called the "but for" rule. *Shelton v. Board of Regents, supra.* In the present case the evidence is uncontradicted that "but for" the collision between the truck and the Jones automobile, the decedent would not have sustained the injuries which ultimately led to his death.

The next element is that the injury be the natural and probable result of the negligence. No argument is, or could successfully be, made that such is not the situation in the present case.

The final element, the one which Consolidated Freightways apparently urges is missing, is that there be no efficient intervening cause which breaks the causal connection between the defendant's negligence and the injury. There is no allegation or evidence of any intervening cause occurring *after* the negligence of Consolidated Freightways' driver which caused decedent's death. Kaminski received a directed verdict in his favor on the issue of his negligence, from which no appeal has been taken. A settlement was entered into between decedent's estate and Jones' estate, but the negligence of Jones, if any, did not occur after the negligence of Lucero and cannot, therefore, be an intervening cause sufficient to relieve Lucero from the consequences of his own negligence. Further, "[w]hen separate and independent acts of negligence by different persons combine to produce a single injury, each participant is liable for the damage although one of them alone would not have caused the result." *Libbey-Owens Ford Glass Co. v. L & M Paper Co., supra* at 802, 205 N.W.2d at 530; *Lindgren v. City of Gering,* 206 Neb. 360, 292 N.W.2d 921 (1980).

Consolidated Freightways erroneously focuses on whether the negligence of Jones or Kaminski was the proximate cause of decedent's injuries. Reasoning that any negligence on the part

of its driver would not be an intervening cause sufficient to relieve other drivers from the consequences of their negligence, Consolidated Freightways somehow concludes that the negligence of Lucero cannot be the proximate cause. This approach does not comport with proximate cause analyses of our prior cases and ignores the fact that more than one individual can be the proximate cause of a single incident.

## INSTRUCTIONS REFUSED

The law is well settled that in determining the sufficiency of jury instructions on appeal to this court, such instructions are to be read as a whole; and when they fairly submit the case and did not mislead the jury, there is no prejudicial error. We have also held that it is not error for the court to refuse a request for additional instructions where it has, on its own motion, fairly and fully instructed the jury on a party's theory of the case. *Kresha v. Kresha*, 216 Neb. 377, 344 N.W.2d 906 (1984); *Erickson v. Monarch Indus.*, 216 Neb. 875, 347 N.W.2d 99 (1984).

It is with this rule in mind that we consider Consolidated Freightways' contention that the trial court should have instructed on the act of God defense and the unavoidable accident and sudden emergency doctrines.

## Act of God

Consolidated Freightways requested that NJI 2.02B be given. This instruction, after stating it is the defendant's burden to prove that the sole proximate cause of the accident was an act of God, defines such an act as "a manifestation of nature so unusual and extraordinary that it could not under normal conditions have been reasonably anticipated or expected." This instruction mirrors the applicable case law. *Cover v. Platte Valley Public Power & Irr. Dist.*, 167 Neb. 788, 95 N.W.2d 117 (1959); *Snyder v. Farmers Irr. Dist.*, 157 Neb. 771, 61 N.W.2d 557 (1953).

Even though the act of God defense was pled and timely objection was made to the trial court's refusal to so instruct, this assignment of error must fail because the evidence does not support the defense. It is clear that it is the duty of the trial court to instruct the jury only on issues which are pled and which find support in the evidence. *Herman v. Midland Ag Service, Inc.*,

200 Neb. 356, 264 N.W.2d 161 (1978); *Swartz v. Peterson*, 199 Neb. 171, 256 N.W.2d 681 (1977); *Golonka v. Gatewood*, 199 Neb. 216, 257 N.W.2d 403 (1977); *Schmidt v. Johnson*, 184 Neb. 643, 171 N.W.2d 64 (1969).

Lucero knew it was misting or raining, that it was getting colder, and that bridges often become icy before the rest of a highway. In fact, he took measures in recognition of that latter fact to prepare for encountering the first icy spot. Under those circumstances, coming upon an icy bridge is clearly not "a manifestation of nature so unusual and extraordinary that it could not under normal conditions have been reasonably anticipated or expected."

## Unavoidable Accident

Consolidated Freightways also complains that its requested instruction concerning the unavoidable accident rule was not given. In the present case the jury was adequately instructed that the plaintiff, before receiving a favorable verdict, must prove by a preponderance of the evidence that Consolidated Freightways was negligent and that such negligence was the proximate cause of the collision and decedent's injuries and death. Preponderance of the evidence, negligence, and proximate cause were all defined in other instructions.

Where the jury is properly instructed concerning the plaintiff's burden to prove that the defendant's negligence was the proximate cause of the injury, it is ordinarily not error to either give or refuse to give an instruction on unavoidable accident. *Schmidt v. Johnson, supra; Harding v. Hoffman*, 158 Neb. 86, 62 N.W.2d 333 (1954); *Bonacci v. Cerra*, 134 Neb. 476, 279 N.W. 173 (1938).

The unavoidable accident issues were adequately before the jury.

## Sudden Emergency

Consolidated Freightways requested that NJI 3.09 be given, which reads as follows:

> When a person by a sudden emergency which is not due to his own negligence is placed in a position of immediate danger and has insufficient time to determine with certainty the best course to pursue, he is not held to the same accuracy of judgment as is required under ordinary

circumstances, and if he pursues a course of action to avoid an accident, such as an ordinary, prudent person placed in a similar position might choose, he is not guilty of negligence, even though he did not adopt the wisest choice.

Thus, in order for the doctrine to be invoked, there must exist (1) a sudden emergency not of the actor's own making, (2) alternative courses of action from which to choose, and (3) a need for instant decision. The rule holds that one confronted with such demands is not necessarily negligent in pursuing a course of action which more mature reflection or deliberate judgment might prove to be wrong. *Swartz v. Peterson, supra; Kraft v. Fundum*, 175 Neb. 821, 124 N.W.2d 225 (1963).

The sudden emergency doctrine is to be submitted to the jury where there is evidence that a wrong course of action was pursued, from the results of which the actor is to be excused because of the stress and shortness of time under which the decision was made. *Kraft v. Fundum, supra.* In *Kraft* the driver could not move to the right but only to the left in an effort to avoid the collision. He attempted to move to the left but was unable to avoid the collision. We held it was not error to refuse to instruct the jury on the sudden emergency doctrine. In doing so we said the doctrine did not apply because there was no evidence a wrong choice was made because of the stress of the occasion. There simply was no choice.

In the present case Lucero had no real choices. He testified that when he saw what was happening ahead of him, he was but 110 feet away from the Kaminski and Jones automobiles. He realized he could not stop. Since he could not leave the bridge, the only thing he could do in an effort to avoid a collision was to go around the automobiles, as he claimed he unsuccessfully attempted. Just as in *Kraft*, Lucero was not presented with any reasonable alternatives from which to choose. That being the case, it was not error to refuse to instruct the jury on the sudden emergency doctrine.

## INSTRUCTION GIVEN

This assignment claims it was error for the trial court to give the following range of vision instruction:

A motorist ordinarily has a duty to drive an automobile

on a public street or highway at night in such a manner that he can stop in time to avoid a collision with an object within the area lighted by his headlights, and he is negligent if he fails to do so.

A motorist is not, however, negligent where the object cannot be observed by the exercise of ordinary care in time to avoid a collision.

In effect, then, the trial court instructed on the range of vision rule, as well as an exception to it. Consolidated Freightways claims this was error, relying primarily on *Bartosh v. Schlautman*, 181 Neb. 130, 147 N.W.2d 492 (1966), in which the trial court refused to give a range of vision instruction which did not contain an exception such as that contained in the last paragraph of the instruction given in the present case. The *Bartosh* majority said:

The applicability of the rule, as a matter of law, depends on the individual circumstances and is for the court's determination. Where an exception clearly applies, the general rule does not apply. Where the general rule does not apply as a matter of law, the determination of negligence is for the jury under the rules and standards of due care under the particular circumstances as applied in motor vehicle cases.

*Id.* at 133-34, 147 N.W.2d at 495.

The *Bartosh* holding, therefore, does not apply to this case, for it does not deal with the situation where neither the rule nor an exception clearly applies as a matter of law. That is the situation presented by this case.

Consolidated Freightways' evidence was that Lucero could not see the automobiles sooner because they were without lights, and the terrain of the roadway caused the truck's own headlights to shine up over them. Plaintiff's evidence, together with the proper inferences to be drawn from it, is that the terrain was not so steep, and, therefore, the headlights would not shine over the automobiles, and that Lucero was following too closely, considering the weather and road conditions. The first paragraph of the instruction supports plaintiff's theory, whereas the second paragraph supports that of Consolidated Freightways. The instruction does not, as Consolidated

Freightways argues, require the finding of a verdict for the plaintiff.

As stated in *Duling v. Berryman*, 193 Neb. 409, 412, 227 N.W.2d 584, 586 (1975): "Where the testimony is conflicting as to whether the range of vision rule is applicable or whether another factual version of how the accident occurred is supported by the evidence, then it becomes the duty of the court to submit both factual issues to the jury." See, also, *McCauley v. Briggs*, 218 Neb. 403, 355 N.W.2d 508 (1984); *Maurer v. Harper*, 207 Neb. 655, 300 N.W.2d 191 (1981).

Taken as a whole, the instruction given fairly submitted the issue to the jury.

## AMOUNT OF VERDICT

In its last assignment of error, Consolidated Freightways contends the verdict is excessive, as plaintiff failed to prove the money value of decedent's companionship, counseling, and advice lost by the widow and next of kin.

Neb. Rev. Stat. § 30-810 (Reissue 1979) provides that a verdict or judgment in a wrongful death action "should be for the amount of damages which the persons [the widow and next of kin] in whose behalf the action is brought have sustained."

We have held that a wrongful death plaintiff may only recover for a pecuniary loss, meaning a loss which has a money value. *Godden v. Department of Public Welfare*, 193 Neb. 269, 226 N.W.2d 627 (1975); *Dow v. Legg*, 120 Neb. 271, 231 N.W. 747 (1930); *Fisher v. Trester*, 119 Neb. 529, 229 N.W. 901 (1930).

We have also noted, however, that the word "pecuniary" is not to be construed in a strict sense, that it is difficult to determine its exact measure, and that the task of determining such must be left to the good judgment and ordinary common sense of the jurors. The law does not provide any positive, definite mathematical formula or legal rule by which a jury shall fix the amount of pecuniary loss; it must be determined upon a consideration of the circumstances of each case. *Selders v. Armentrout*, 192 Neb. 291, 220 N.W.2d 222 (1974); *Mabe v. Gross*, 167 Neb. 593, 94 N.W.2d 12 (1959). There is no requirement that there be evidence of the dollar value of companionship, counseling, or advice. It is a matter left to the

sound discretion of the jury.

As we have said in the past, it is only where a wrongful death verdict is such that it can be accounted for only on the basis of passion and prejudice on the part of a jury that this court will interfere. *Caradori v. Fitch*, 200 Neb. 186, 263 N.W.2d 649 (1978); *Kroeger v. Safranek*, 165 Neb. 636, 87 N.W.2d 221 (1957).

Considering the nature and duration of the relationship between decedent and his widow and decedent's life expectancy, we conclude that for the widow's loss of decedent's companionship, counseling, and advice alone, the portion of the verdict for other than the out-of-pocket expenses is not so excessive as to warrant our interference. This conclusion makes further discussion of the amount of the verdict unnecessary.

The record sustaining none of Consolidated Freightways' assignments of error, the judgment of the trial court is affirmed.

AFFIRMED.