IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

GOLDHAMMER V. LINCOLN ANESTHESIOLOGY GROUP

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

TIM GOLDHAMMER, INDIVIDUALLY AND AS SPECIAL ADMINISTRATOR
OF THE ESTATE OF WILLIAM GOLDHAMMER, DECEASED, APPELLANT,

v.

LINCOLN ANESTHESIOLOGY GROUP, P.C., APPELLEE.

Filed July 7, 2020.    No. A-19-447.

Appeal from the District Court for Lancaster County: DARLA S. IDEUS, Judge. Affirmed.

Ronald J. Palagi, of Law Offices of Ronald J. Palagi, P.C., L.L.C., for appellant.

William L. Tannehill and Elizabeth Ryan Cano, of Wolfe, Snowden, Hurd, Ahl, Sitzmann, Tannehill & Hahn, L.L.P., for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

William Goldhammer (William) arrived at Saint Elizabeth Regional Medical Center (Saint Elizabeth) in Lincoln, Nebraska, for surgery to correct his deviated nasal septum and chronic sinusitis issues in December 2012. William died in connection with complications that occurred during the administration of preoperative anesthesia. In 2014, William's father, Tim Goldhammer (Goldhammer), in his personal capacity and as special administrator of the Estate of William Goldhammer (the estate), filed this lawsuit in the Lancaster County District Court against Saint Elizabeth and Lincoln Anesthesiology Group, P.C., the entity that had served as the provider of anesthetic care. Prior to trial, Saint Elizabeth was dismissed with prejudice from the case pursuant to a settlement agreement with Goldhammer. After trial, a jury returned a verdict in favor of

- 1 -

Lincoln Anesthesiology Group. On appeal, Goldhammer challenges the district court's decision to not admit exhibit 50, an alleged "code blue" document, despite repeated attempts to offer the exhibit through various witnesses. He also argues that the district court's definition of the word "pecuniary" in a jury instruction was erroneous. We affirm.

## II. BACKGROUND

In December 2012, Lincoln Anesthesiology Group was a provider of anesthetic services for some patients hospitalized at Saint Elizabeth. At that time, William was 21 years old. According to his medical records, William had a history of asthma and some environmental allergies, but no known drug allergies. He had a deviated nasal septum, chronic ethmoidal sinusitis, and chronic maxillary sinusitis. His otolaryngologist, Dr. Michael Rapp, scheduled William to receive outpatient surgery to correct those nasal conditions after a different doctor determined that William was at a low risk for surgical complications and was expected to tolerate the septoplasty procedure without difficulty. The surgery was intended to straighten out William's nose, debride his sinus area, clear up his airway, and make it easier for him to breathe.

On December 17, 2012, William entered Saint Elizabeth for the outpatient septoplasty operation. The operation required anesthesiology to be performed at the outset. Lincoln Anesthesiology Group employee, Todd Smith, a certified registered nurse anesthetist (CRNA), recalled intubating William without difficulty after administering various medical drugs to him. However, upon completion of the intubation, Smith discovered that William was not receiving oxygen. Smith said he would have told Nancy Christy, a registered nurse for the hospital who was also in the operating room, that William was "having trouble ventilating, may be a bronchospasm." The record reflects that a bronchospasm refers to a restricted airway. Christy agreed with Goldhammer's counsel that 1 to 2 minutes after Smith did the intubation, Smith said, "[W]e have trouble." Christy said she then walked over to William and saw that his lips were blue and his skin was gray; she said that meant he was receiving little or less than a normal amount of oxygen. Christy asked Smith what was wrong. Christy thought that Smith told her "it could be a bronchospasm." Smith disagreed that William's lips and skin were those colors at that time. Smith indicated that he believed that the process of "preoxygenation" before he had "gotten [William] off to sleep" helped William maintain a pulse and a blood pressure for some time following intubation. Smith described preoxygenation as providing a reserve of "100 percent oxygen" into a patient's lungs.

Smith described taking a variety of initial actions to determine why he was unable to ventilate William. Smith then directed Christy to call a four-digit telephone number to reach one of the head anesthesiologists. Christy related that she followed that instruction but the person who answered the call said that particular anesthesiologist was busy. Smith then directed Christy to call another four-digit telephone number to reach a different head anesthesiologist. Christy indicated that she followed that instruction as well, saying she called anesthesiologist Dr. John Varvel and asked for help.

After Dr. Varvel received Christy's call, he headed to the operating room. When Dr. Varvel walked in the room, William, Smith, Christy, and a scrub nurse were there. Dr. Varvel asked what was happening. Smith said he had intubated William and was unable to ventilate him. Dr. Varvel

had not had any exposure to William before then; Smith told the doctor about William's history and what Smith had done so far. Dr. Varvel said he confirmed that William had a pulse and then proceeded to determine the cause of the inability to ventilate. According to Dr. Varvel, when he got to the operating room, William's skin was not gray and his lips were not blue. The doctor said that gray skin would indicate a lack of a "cardiac output" or a pulse. Smith stated that Dr. Varvel performed some of the same checks that Smith had done but also did some things that he had not yet done. Christy said Dr. Varvel tried to ascertain the steps Smith had gone through to "check to see, so we could eliminate sources of the lack of oxygen."

At some point, Smith and Dr. Varvel prepared to give William intravenously a medical drug called epinephrine. Dr. Varvel indicated that they were preparing to do so because they had "ruled out" all of the "typical mechanical obstructive causes for failure to ventilate and were left with bronchospasm as the most likely diagnosis." According to Smith, as they were preparing to administer the epinephrine, William lost his pulse and entered cardiovascular collapse. In response, epinephrine was administered and chest compressions were given. Smith said William's complexion started to turn gray around that time. Smith indicated that while William was receiving chest compressions, Christy called the "code blue." Smith said that Dr. Varvel was the one to tell Christy to call the code blue. Christy said that she was told to call the code at some point when she asked how William's heart was doing and learned that his heart rate was starting to decrease; she then called the code blue team.

Christy testified that prior to being directed to call the code blue, she had asked Smith at least two times whether to call a code but that both times he told her no. Smith agreed that prior to when the code blue was directed to be called, Christy had asked whether anyone wanted a code to be called, but Smith said that at that earlier point "it was still just an airway and unable to ventilate problem" as opposed to a "cardiovascular collapse problem." Smith had items on his anesthesia "crash cart" to deal with the airway problem. A cardiovascular collapse would be "why you would call a code in the hospital outside of the [operating room]." Dr. Varvel did not recall Christy asking whether she should call a code. Dr. Varvel said that epinephrine was not given sooner because the bronchospasm diagnosis was not made until "seconds" before William had a cardiac arrest.

Individuals responded to the code blue once it was called. One of those individuals was Rebecca Childress, a Saint Elizabeth employee whose nursing role included being the code blue recorder to document the events that happened during the code blue. William continued to be treated after the code was called and was eventually placed on life support. The record reflects that William was then in a coma. Dr. Varvel and Smith understood that William ultimately suffered an anoxic brain injury, meaning a lack of oxygen to the brain. On December 21, 2012, William died shortly after his parents decided to take him off of life support. Dr. Rapp's medical notes showed that the cause of death was due to respiratory failure from an anoxic brain injury. According to Dr. Rapp, a final autopsy "shed no real light on what happened." The doctor noted that there was an indication from a level of a chemical in William's blood that William had an anaphylactic reaction. Dr. Rapp testified that anaphylaxis is an extreme allergic reaction. A bronchospasm usually causes "wheezing" but anaphylaxis can cause "complete obstruction, meaning you cannot move air in and out of your lungs." Dr. Rapp said that a patient with an anaphylactic bronchospasm is treated with epinephrine. Dr. Varvel recalled that before the code blue had been called, William had not

manifested various indicators of anaphylaxis, such as swelling, hives or redness, or a sudden drop of blood pressure. Dr. Varvel indicated that there had been a presumption that William was experiencing anaphylaxis when he went into cardiac arrest and had been suffering a severe bronchospasm.

In September 2014, Goldhammer, individually and as special administrator of the estate, filed a "wrongful death and survival action" against Saint Elizabeth and Lincoln Anesthesiology Group. Goldhammer alleged that each defendant had committed medical negligence in connection with their care of William in December 2012. Goldhammer sought entry of a judgment against both defendants and for an award of damages and other relief. In December 2014, Lincoln Anesthesiology Group filed an answer, denying the material allegations of the complaint and asking for its dismissal.

On March 4, 2016, Goldhammer, individually and as special administrator of the estate, filed an amended complaint against the same defendants. Goldhammer claimed that the defendants' employees and/or agents were negligent and violated the "standard of medical care" in five enumerated ways, including the failure to (1) recognize and treat the signs of bronchospasm and anaphylaxis and (2) timely call an emergency code and/or respond appropriately to the emergency. Goldhammer alleged that the negligence caused William's death. Damages were sought for William's predeath physical and mental pain and suffering; funeral, burial, medical, and hospital expenses; William's parents' loss of society, comfort, care, and companionship; and the parents' emotional distress related to events preceding William's death. Among other things, Goldhammer requested a judgment against both defendants for special and general damages.

On March 7, 2016, Lincoln Anesthesiology Group filed an answer to the amended complaint. In addition to denying the material allegations of the amended complaint, Lincoln Anesthesiology Group specifically denied that it or any of its agents, employees, or representatives were negligent in any manner. It alleged that the amended complaint failed to state a claim upon which relief could be granted against Lincoln Anesthesiology Group. It contended that the damages claimed by Goldhammer were not the proximate result of a departure from the standard of care by Lincoln Anesthesiology Group. Lincoln Anesthesiology Group requested that the amended complaint be dismissed. The record reflects that pursuant to a settlement agreement, Saint Elizabeth was dismissed with prejudice from this action by an order dated April 10, 2017. This action proceeded to trial against only Lincoln Anesthesiology Group.

A 7-day jury trial took place between November 5 and November 14, 2018. The issues tried to the jury were whether Lincoln Anesthesiology Group was professionally negligent by (1) failing to recognize the signs of bronchospasm and anaphylaxis and to timely treat it with epinephrine and/or (2) failing to timely call a code blue. Other issues were whether the alleged negligence proximately caused William's death and the nature and extent of damages. Goldhammer's case in chief included his own testimony, as well as testimony from William's mother, Childress, Dr. Rapp, Christy, and Brent Sommer—a CRNA called as an expert witness. Further, Goldhammer read in open court portions of depositions given by his other expert witnesses, Dr. Brian McAlary and Dr. Steven Yun, both anesthesiologists. A number of exhibits offered by Goldhammer were received in evidence. Throughout trial, Goldhammer's counsel offered as evidence exhibit 50, an alleged "code blue log," with no success. After Goldhammer

rested, the defense moved for a directed verdict and to dismiss the case. The motion was denied. Lincoln Anesthesiology Group then put on evidence of exhibits as well as testimony from Smith, Dr. Varvel, and its expert witnesses, Dr. Merlin Wehling, an anesthesiologist, and Dr. Steven Wooden, an individual with a doctor of nursing practice who was the managing partner in a private anesthesia practice and who had also remained licensed as a CRNA. Goldhammer adduced further testimony from William's mother in rebuttal and then rested. After the jury was excused for a break, the defense moved for a directed verdict in its favor. That motion was overruled.

The district court instructed the jury on November 14, 2018, and the case was submitted to the jury. As relevant to this appeal, jury instruction No. 2 stated that Goldhammer could recover against Lincoln Anesthesiology Group if he proved by a greater weight of the evidence (1) that Smith and/or Dr. Varvel were professionally negligent in one or more of the ways claimed by Goldhammer, (2) that any such professional negligence of Smith and/or Dr. Varvel was a proximate cause of William's death, (3) that William's death was a proximate cause of some damage to his next of kin, and (4) the nature and extent of any "pecuniary loss" sustained by the next of kin as a result of William's death. A separate jury instruction informed that Goldhammer and William's mother were William's next of kin. No separate jury instruction defined "pecuniary loss," but jury instruction No. 9 covered the issue of determining damages.

On the morning of November 15, 2018, the jury submitted a question to the district court asking for a "clear definition" of the word "'pecuniary'" used in instruction No. 2. Later that same morning, the district court went on the record with counsel for each party. The district court stated that during a telephone conference with the parties regarding the jury's question, all had agreed that an appropriate response would be to tell the jury to reread the instructions in their entirety. The district court said that upon rereading the jury instructions, it was concerned that instruction No. 9 did not clearly instruct the jury that it had to consider any comfort or companionship that William gave to his parents. The district court let the parties' counsel review its proposed amended instruction No. 9, as well as a new instruction defining pecuniary loss. The defense believed that the jury had already been adequately instructed; it moved for a mistrial, suggesting one or both proposed instructions overly emphasized the issue of damages. That motion was denied. Goldhammer's counsel believed it would be reversible error if instruction No. 9 as amended was not given to the jury. Goldhammer's counsel argued that additional language was needed in the other proposed jury instruction; the district court disagreed. Thereafter, the amended and substituted instruction No. 9 and the new instruction defining pecuniary loss, instruction No. 19, were given to the jury. The jury resumed its deliberations.

On November 16, 2018, outside the presence of the jury, Goldhammer's counsel moved for a mistrial due to the additional jury instructions provided. That motion was denied. Later that same day, the jury returned a verdict in favor of Lincoln Anesthesiology Group. The district court accepted the verdict and entered an order of judgment reflecting the same.

On November 21, 2018, Goldhammer filed a motion for a new trial on a variety of grounds, including that the district court erred by refusing to admit exhibit 50 and failing to "properly respond and instruct as to the jury's questions." The motion was addressed during a hearing in February 2019. On April 12, the district court issued an order in which it overruled Goldhammer's

motion for a new trial. In doing so, the district court found no error in its ruling to not receive exhibit 50 in evidence and its action in giving additional instructions to the jury.

Goldhammer appeals.

## III. ASSIGNMENTS OF ERROR

Goldhammer claims the district court (1) abused its discretion by sustaining objections to the admissibility of exhibit 50 and (2) erred by failing to give a complete and correct jury instruction defining the word "pecuniary."

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Rodriguez v. Surgical Assocs.*, 298 Neb. 573, 905 N.W.2d 247 (2018). A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Id*.

Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated. *O'Brien v. Cessna Aircraft Co.*, 298 Neb. 109, 903 N.W.2d 432 (2017). An appellate court reviews the trial court's ruling on authentication for abuse of discretion. *Id*. In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Id*.

A trial court's response to a question posed by the jury is reviewed for an abuse of discretion. See, *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015); *In re Petition of Omaha Pub. Power Dist.*, 268 Neb. 43, 680 N.W.2d 128 (2004).

## V. ANALYSIS

### 1. ADMISSIBILITY OF EXHIBIT 50

Goldhammer claims the district court erred by excluding exhibit 50 from evidence; he refers to exhibit 50 as the code blue log. Goldhammer argues that exhibit 50 was properly authenticated, was not offered to prove the truth of the matter asserted, and was an admission of a party opponent. He suggests that even if exhibit 50 is hearsay, the exhibit was admissible under the business records exception to the hearsay rule or could be considered an "inscribed chattel" to avoid "any hearsay problems." Brief for appellant at 11. Goldhammer asserts that exhibit 50 is "relevant and material." *Id.* at 7. He contends that he was denied the opportunity to show that a "medical chart" was "improperly recorded or altered." *Id.* This vague reference to a medical chart apparently refers to exhibit 45, which was identified by Childress during trial as the code blue record she had made and which was admitted in evidence. Goldhammer asserts that exhibit 50 would have proven that the "original time written in the chart [(presumably, referring to exhibit 45)] was correct and that 10 minutes passed before [Lincoln Anesthesiology Group] called the code and gave [e]pinephrine." *Id.*

Lincoln Anesthesiology Group points out that exhibit 50 is not a medical record related to the care and treatment provided to William during the code blue call, and that "a code blue record

that is created by a code blue recorder to document the care and treatment being provided to the patient" was offered and admitted without objection as exhibit 45, and that "[w]itnesses testified extensively about this document." Brief for appellee at 17-18. Lincoln Anesthesiology Group further contends it did not create or maintain exhibit 50, nor did it produce it in discovery. It contends "the record affirmatively shows that Exhibit 50 was actually produced by dismissed party St. Elizabeth." *Id*. at 18.

### (a) Other Evidence Related to Specific Timing of Events

Before discussing exhibit 50, we again note that the primary contested issues at trial were whether William was timely treated with epinephrine and whether a code blue was timely called. Although it is unnecessary to go into detail here regarding the ample evidence that was adduced that went to those issues, we set forth some of that evidence for additional context in addressing Goldhammer's argument.

Childress' code blue record, exhibit 45, reflected that it was a record belonging to Saint Elizabeth as to the care of William on December 17, 2012. It was a typewritten form filled in by handwriting. According to exhibit 45, William was intubated at 8:38 a.m. The corresponding entry for a fillable field called "Time Event Recognized" appeared to initially be 8:51 a.m. and later changed to 8:41 a.m. Childress interpreted that entry to mean "when they recognized a problem" and she said she recorded it as 8:41 a.m. As far as the original time entry appearing to have been written over, she recalled that the reason she would do that is that at 8:51 a.m. she responded to the operating room and began documenting but that the event was recognized before she arrived to the room. She agreed that she would have spoken with someone once things had calmed down and when she felt it was appropriate to gather information from other people related to what happened before she arrived. Childress was not able to say if the times on exhibit 45 were estimates.

Christy identified exhibit 53 as her record, which is a document that refers to the care of William on December 17, 2012. According to exhibit 53, William was in the operating room and anesthesia began at 8:30 a.m., anesthesia induction was at 8:33 a.m., and a surgeon arrived at 8:45 a.m. Christy agreed that she was not a "clock watcher" and that the times she "gave" on "some of the records" were estimates. Smith's anesthesia record was received in evidence as exhibit 54. It showed that it related to the care of William on December 17, and that anesthesia was started at 8:33 a.m. Smith did not chart the time of intubation. He disagreed with the accuracy of the 8:38 a.m. intubation time on exhibit 45, as well as that exhibit's suggestion that the first dose of epinephrine was given at 8:51 a.m. (Smith said that was the second dose). Smith acknowledged his prior deposition testimony that William was ready for intubation sometime between 8:35 a.m. and 8:40 a.m.; but Smith indicated during trial that that would have been an estimate. Smith believed there was no way to pinpoint times for when each event occurred. Dr. Varvel said he did not look at a clock when he got the call from Christy or when he got to the operating room. Dr. Varvel said he did not look at a clock or have a specific memory of when the code was called or when the epinephrine was given, though he said the epinephrine dose given at 8:51 a.m. would have been the second or third dose.

According to Goldhammer and William's mother, William was taken from a short-stay room to the operating room at or around 8:30 a.m. by Christy. Goldhammer and William's mother then went downstairs to a cafeteria for breakfast. Generally, their testimony was that when the code blue was announced over the intercom system they were in the cafeteria and they looked at Goldhammer's cell phone and saw that it displayed a time of 8:50 a.m.

(b) Exhibit 50

Exhibit 50 is a 1-page document containing only two rows of typewritten information. The first row states in two different boxes "2012 - DEC" and "CODE BLUE & RRT." The second row states in separate boxes in the following order from left to right: "12/17/2012," "8:50am," "Code Blue OR #1," "Alice/ LaVonna/ Betty," "Followed Procedures," and "X." (Emphasis omitted.)

*(i) Attempt to Offer Exhibit 50 Through Dr. Rapp's Testimony*

Regarding December 17, 2012, Dr. Rapp recalled that he heard the code blue "overhead" as he was making his way to the operating room. He did not know what time it was that he got to the room. He did not know if a code blue recorder was in the room. In response to questioning by Goldhammer's counsel, Dr. Rapp answered that he did not know what time the code blue was called.

Upon further questioning, Dr. Rapp agreed that the hospital keeps a paging system, that he had worked at Saint Elizabeth a long time, and that he was familiar with the fact that the hospital called code blues. Dr. Rapp answered that a code call went to operators first and was then distributed over an intercom system and to people carrying "code pagers." At that point, Goldhammer's counsel showed Dr. Rapp exhibit 50 and asked if it would "help refresh [his] recollection as to the time the code blue was called on December 17th?" Counsel for Lincoln Anesthesiology Group objected, arguing that Dr. Rapp had not indicated that he had a recollection that could be refreshed. The objection was sustained.

Goldhammer's counsel again asked Dr. Rapp whether he knew what time the code blue was called. Opposing counsel objected to the doctor reading from a document that was not in evidence and which the doctor had "no foundation to testify from." The district court instructed Dr. Rapp to put aside the document and asked, "Do you have any recollection, sir, of when the code blue was called?" Dr. Rapp said, "Only that it was in the morning." At that, Goldhammer's counsel again asked if exhibit 50 would refresh the doctor's recollection. In response, Dr. Rapp said, "It is a form showing the time of the morning I would have expected." Dr. Rapp answered that the form showed a date. But defense counsel successfully objected on hearsay and foundation grounds to Dr. Rapp answering what date the document showed.

*(ii) Offer of Exhibit 50 Outside Presence of Jury*

Thereafter, outside the presence of the jury, Goldhammer's counsel offered exhibit 50 as a "phone log" that was "produced by Saint Elizabeth." Opposing counsel objected on the grounds of hearsay and foundation. Goldhammer's counsel argued that exhibit 50 was produced in response to discovery, believing that showed that it was a business record kept in the normal course of business for a code blue. Goldhammer's counsel asserted that exhibit 50 was "produced under

oath" by Saint Elizabeth and was an admission by a party to the lawsuit "at the time." The district court sustained the foundation and hearsay objection.

### (iii) Second Offer of Exhibit 50 Outside Presence of Jury

Later, during Goldhammer's case in chief and while the jury was excused, Goldhammer's counsel made an offer of proof of exhibit 50. Goldhammer's counsel stated that it was produced by Saint Elizabeth in response to a specific request for discovery. Goldhammer's counsel argued that it was properly authenticated and was not offered to prove the truth of the matter asserted but to prove "the defendant heard this." Counsel also argued that it was an admission by a party opponent and that it qualified as a business record or an inscribed chattel. Counsel contended that exhibit 50 was evidence that the code blue call went out at 8:50 a.m. Defense counsel stood on earlier objections to the exhibit on the grounds of foundation and hearsay, and said exhibit 50 was neither produced in discovery by Lincoln Anesthesiology Group, nor under its control or custody. Lincoln Anesthesiology Group disputed that the code blue went out at 8:50 a.m. The record reflects that the parties provided the district court with memorandums of law on the matter. After the district court took the matter under advisement, it ruled that the objection to the admissibility of exhibit 50 was sustained on the grounds of hearsay and foundation.

### (iv) Attempt to Offer Exhibit 50 Through Smith's Testimony

During cross-examination, Smith testified that he did not see the code blue being called. He knew that somebody was heading "over there" to make that call. Smith confirmed that when that call was made, it went to an operator who announced the code blue over the intercom system. Goldhammer's counsel showed Smith exhibit 50, suggesting Smith use it to refresh his recollection as to the time the code blue was called. Smith responded, "I do not have a recollection of the time when the code blue was called." Goldhammer's counsel said, "Would you look at Exhibit 50 and see if that refreshes your recollection?" Smith answered that he did not look at the clock when the code blue was called so he could not say "what this number is." Goldhammer's counsel asked Smith to look at exhibit 50 and say whether it reflected the time. Defense counsel then objected to Smith reading from the exhibit that was not in evidence and added that Smith had indicated the document did not refresh his recollection. The objection was sustained. Smith testified that he neither looked at the clock when the code blue was called, nor looked at the clock when the code blue recorder (Childress) arrived to the room. Based on his "sense of time," it seemed to him that it took Childress "longer" than other people to show up.

During a sidebar in the middle of further cross-examination of Smith, Goldhammer's counsel renewed the offer of exhibit 50, suggesting that it was a "record" and that it would refresh Smith's recollection. Goldhammer's counsel asserted that Smith's testimony was that "it took a long time" but counsel did not know "what the time is." Goldhammer's counsel thought that exhibit 50 would contradict Smith's testimony that, in counsel's words, "it took a long time." Counsel for Lincoln Anesthesiology Group objected on foundation, relevance, and hearsay grounds; defense counsel argued that Smith did not know what time the code blue was called and that the document did not "refresh" his comment about what seemed like a long time for one "code member" to arrive. The district court sustained the objection on all of the asserted grounds.

*(v) Attempt to Offer Exhibit 50 Through Dr. Varvel's Testimony*

On cross-examination, Dr. Varvel repeated that he did not know what time it was that he called for the code. He said that there was a coding procedure to call a code involving dialing a number on a telephone that connects to an operator. Dr. Varvel was not sure exactly what all the operator did; the operator "probably page[d] several people." Goldhammer's counsel then showed exhibit 50 to Dr. Varvel. The defense objected to Goldhammer's counsel reading from the exhibit that was not in evidence or to using it to refresh Dr. Varvel's memory when foundation had not been laid that the doctor had a memory that could be refreshed by the exhibit. The objections were sustained.

(c) Argument on Appeal Concerning Admissibility of Exhibit 50

Goldhammer first argues that exhibit 50 was admissible because it was properly authenticated. He asserts that exhibit 50 was produced by the "Appellee in direct response of a particularized request by the Plaintiff [(Goldhammer)]" for "all call systems with the anesthesiologist pertaining to William." Brief for appellant at 8. We note that Goldhammer's apparent allegation that exhibit 50 was produced by Lincoln Anesthesiology Group contradicts his counsel's consistent representations during trial that the exhibit was produced in discovery by former defendant Saint Elizabeth, not Lincoln Anesthesiology Group. Goldhammer further argues that because the "Appellee" responded to his request for production with the document that is exhibit 50, it is "self-authenticating," *id.*, citing to Neb. Rev. Stat. § 27-902(7) (Reissue 2016), as support for his argument.

Authentication or identification of evidence is a condition precedent to its admission and is satisfied by evidence sufficient to prove that the evidence is what the proponent claims. See, *O'Brien v. Cessna Aircraft Co.*, 298 Neb. 109, 903 N.W.2d 432 (2017); Neb. Rev. Stat. § 27-901 (Reissue 2016). A court must determine whether there is sufficient foundation evidence for the admission of physical evidence on a case-by-case basis. *O'Brien v. Cessna Aircraft Co., supra.* Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated; we review a trial court's ruling on authentication for abuse of discretion. See *id*. Section 27-901 lists, by way of illustration, 10 means of adequately authenticating a document. Goldhammer does not contend that exhibit 50 was authenticated by any of those means. Goldhammer's counsel had tried to offer the exhibit through the testimony of various witnesses but none of those witnesses seemed to have personal knowledge about it or its scant contents.

We understand Goldhammer's argument to be that because exhibit 50 was produced by a defendant in discovery, authentication was satisfied. The Nebraska Supreme Court responded to substantially the same argument by a plaintiff in *O'Brien v. Cessna Aircraft Co., supra*, though the documents in question in that case were produced by a defendant who was not dismissed from the action ahead of trial. As to that claim, the Supreme Court stated:

> We also reject the broad proposition that producing a document during discovery alleviates a proponent's burden to lay proper foundation for the admissibility of the evidence at trial. Authentication requires more than saying "'my opponent gave me a document.'" While not a high hurdle, it is still the burden of the proponent of the evidence

to provide the court with sufficient evidence that the document or writing is what it purports to be.

*Id*. at 135, 903 N.W.2d at 456. Accordingly, even if exhibit 50 was produced by Lincoln Anesthesiology Group during discovery, Goldhammer could not have relied on that basis alone to sufficiently authenticate that exhibit. Nor has Goldhammer pointed us to any support that would suggest that the production of exhibit 50 during discovery by Saint Elizabeth, a former defendant dismissed with prejudice prior to trial, would be any different than the claim rejected by the Supreme Court in *O'Brien v. Cessna Aircraft Co., supra*.

Without further explanation, Goldhammer cites to § 27-902(7) as a reason why exhibit 50 is self-authenticating. Section 27-902(7) provides that extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to "[i]nscriptions, signs, tags, or labels purporting to have been affixed in the course of business and indicating ownership, control or origin." Goldhammer does not specifically mention which of those categories he believes covers exhibit 50. Looking at exhibit 50 alone, we cannot say that the document can be readily attributed to any entity at all, let alone Saint Elizabeth or Lincoln Anesthesiology Group, so as to conclude that any part of exhibit 50 was affixed in the course of business. Moreover, it is not clear how exhibit 50 itself qualifies as a trade inscription, sign, tag, or label in the first place.

Based on the foregoing, we find no abuse of discretion by the district court in sustaining objections to the admissibility of exhibit 50 for a lack of foundation. Because proper authentication of exhibit 50 was a condition precedent to its admissibility, we need not address Goldhammer's other arguments in support of the admissibility of the exhibit. See *Seldin v. Estate of Silverman*, 305 Neb. 185, 939 N.W.2d 768 (2020) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

2. RESPONSE TO JURY QUESTION FOR DEFINITION OF "PECUNIARY"

Goldhammer's other claim takes issue with jury instruction No. 19 that was given to the jury in response to the jury's question to the district court. As previously noted, jury instruction No. 2 stated that, among other things, Goldhammer could recover against Lincoln Anesthesiology Group if he sufficiently proved the nature and extent of any "pecuniary loss" sustained by William's next of kin as a result of William's death. After the case was submitted to the jury, the jury asked the district court for a "clear definition" of the word "'pecuniary'" used in that instruction. Part of the district court's response was giving the jury a new instruction which defined what a pecuniary loss meant. The definition provided in instruction No. 19 stated: "Pecuniary loss means a loss which has a money value. The law does not provide any positive, definite mathematical formula or legal rule by which a jury shall fix the amount of pecuniary loss. It must be determined upon a consideration of the circumstances of each case."

When the district court met with counsel for each party before it responded to the jury's question, Goldhammer's counsel asked that the jury be instructed as to the word "pecuniary" in accordance with *Reiser v. Coburn*, 255 Neb. 655, 587 N.W.2d 336 (1998). Goldhammer's counsel agreed with the district court's proposed content for instruction No. 19, but suggested it also include something to the effect of, in counsel's words, "'There's no requirement that there be

evidence of dollar value, companionship, counseling and advice. This matter is left to the good judgment and ordinary common sense of jurors.'" The district court did not think that the suggested language was necessary. On appeal, Goldhammer complains that instruction No. 19 did not include his tendered statements of law. He believes he was prejudiced as a result.

As an initial matter, the parties appear to disagree about what our standard of review is for this alleged error. In his appellate brief, Goldhammer relies on *O'Brien v. Cessna Aircraft Co., supra*, for the propositions that whether the jury instructions given by a trial court are correct is a question of law and that when reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. In his reply brief, Goldhammer concedes that the standard of review for his claim is whether the district court abused its discretion, but at the same time he argues that he must satisfy the three-step legal test typically applied to claims challenging the correctness of jury instructions given by a trial court. See *id.* (stating what appellant must show to establish reversible error from court's failure to give requested instruction). Lincoln Anesthesiology Group asserts that Goldhammer's claim must be reviewed for an abuse of discretion. For the reasons that follow, we agree.

Lincoln Anesthesiology Group correctly points out that during the jury instruction conference, Goldhammer did not object to instruction No. 2 or request any instruction on the meaning of pecuniary. Instructions must be considered and construed together, and if they are not sufficiently specific in some respects, it is the duty of counsel to offer requests for instructions that will supply the omission and, unless this is done, the judgment will not ordinarily be reversed for such defects. See *O'Brien v. Anderson*, 177 Neb. 635, 130 N.W.2d 560 (1964). Goldhammer's claim is essentially that the district court's response to the jury's question submitted during its deliberations was not complete and therefore was incorrect. Whether to answer a question of law posed by a jury which has retired for deliberations is a matter entrusted to the discretion of the trial court and in the absence of an abuse of that discretion, its action will not be disturbed on appeal. See *Sedlak Aerial Spray v. Miller*, 251 Neb. 45, 555 N.W.2d 32 (1996). The trial judge is in the best position to sense whether the jury is able to proceed with its deliberations and has considerable discretion in determining how to respond to communications indicating that the jury is experiencing confusion. *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015) (Nebraska Court of Appeals correctly held that trial court did not abuse its discretion by how it responded to jury question). A trial court's response to a question posed by the jury is reviewed for an abuse of discretion. See, *id.*; *In re Petition of Omaha Pub. Power Dist.*, 268 Neb. 43, 680 N.W.2d 128 (2004). We proceed to review for an abuse of discretion the district court's decision to not include Goldhammer's suggested additions in jury instruction No. 19.

The statements of law which Goldhammer suggested to the district court and which Goldhammer now continues to urge should have been included in instruction No. 19 can be found in *Reiser v. Coburn, supra*. In that case, the Nebraska Supreme Court stated that a plaintiff in a wrongful death case can recover damages only for loss of the deceased's society, comfort, and companionship which are shown by the evidence to have a pecuniary value. The Supreme Court said that it had recognized that in that context,

> "the word 'pecuniary' is not to be construed in a strict sense, that it is difficult to determine
> its exact measure, and that *the task of determining such must be left to the good judgment*

*and ordinary common sense of the jurors*. The law does not provide any positive, definite mathematical formula or legal rule by which a jury shall fix the amount of pecuniary loss; it must be determined upon a consideration of the circumstances of each case. [Citations omitted.] *There is no requirement that there be evidence of the dollar value of companionship, counseling, or advice.*"

*Id.* at 660, 587 N.W.2d at 340 (quoting *Maloney v. Kaminski*, 220 Neb. 55, 368 N.W.2d 447 (1985)) (emphasis supplied). In *Maloney v. Kaminski, supra*, the Nebraska Supreme Court had also stated that a "wrongful death plaintiff may only recover for a pecuniary loss, meaning a loss which has a money value." *Id.* at 69, 368 N.W.2d at 458. The district court had indicated that the language in jury instruction No. 19 combined the authority found in *Reiser v. Coburn, supra*, and *Maloney v. Kaminski, supra*. The statements of law in jury instruction No. 19 were correct under that authority.

Instructions given to a jury must be construed together, and if when considered as a whole they properly state the law they are sufficient. See *O'Brien v. Anderson, supra*. The district court's response to the jury's question included not only providing instruction No. 19, but also amending instruction No. 9 to guide the jury in ascertaining an amount of damages in the event that it returned a verdict for Goldhammer. The original instruction No. 9 did inform the jury that if it reached the issue of damages, it would have to determine the "amount of money and the monetary value of the services, comfort and companionship" that William would have contributed to his parents had he lived. In making that determination, the jury was to consider the physical and mental health of William had he not suffered the injuries that caused his death, William's life expectancy immediately before the injuries that caused his death, and the life expectancies of his parents. The amended instruction No. 9 retained all of that language, however, it added that the jury was also to consider "[a]ny comfort or companionship that [William] gave to [Goldhammer and William's mother] before his death, and the prospect that there would have been changes in the future." Instruction No. 9, as amended and substituted, closely tracked the applicable model jury instruction, NJI2d Civ. 4.60, in a manner relevant to the circumstances of this case. See *In re Estate of Clinger, supra* (general rule is that whenever applicable, Nebraska Jury Instructions are to be used).

Reading together instruction No. 2, instruction No. 9 as amended and substituted, and instruction No. 19, the jury was informed as follows. Goldhammer had to have sufficiently proved the nature and extent of any pecuniary loss sustained by Goldhammer and William's mother as a result of William's death. A pecuniary loss means a loss which has a money value; one for which the law does not provide any positive, definite mathematical formula or legal rule by which a jury shall fix the amount of the loss; and one that must be determined upon a consideration of the circumstances of each case. If the jury reached the issue of having to determine the amount of damages, it was to determine the amount of money and monetary value of the services, comfort and companionship that William would have contributed to Goldhammer and William's mother had he lived; factors to consider when determining that amount were, among other things, any comfort or companionship that William gave to his parents before his death plus the prospect that there would have been changes in the future. Considered together, these instructions were proper

statements of law about wrongful death damages and, thus, were sufficient. See *O'Brien v. Anderson, supra*.

Goldhammer argues that instruction No. 19 had to include that the task of determining the pecuniary loss was left to the good judgment and ordinary common sense of the jurors and that there was no requirement that there be evidence of the dollar value of companionship, counseling, or advice. Those are correct statements of law. See *Reiser v. Coburn*, 255 Neb. 655, 587 N.W.2d 336 (1998). However, the instructions relevant to that matter which were given to the jury implied that if the jury reached the issue of damages, it was up to the jury to determine a sum based upon the circumstances of this case and not any rigid mathematical formula or legal rule. The jury was thoroughly instructed that to determine that amount it could consider a number of factors which it could find represented an amount of money and/or a monetary value. A reasonable juror could have inferred from the totality of the instructions discussed previously that there need not have been evidence put on by Goldhammer of any pecuniary loss in the form of actual dollar figures. The jury would have had to assign a monetary figure to any such evidence. Goldhammer's proposed language, while not incorrect, would have been redundant to the instructions actually given to the jury. The district court had considerable discretion in determining how to respond to the jury's submitted question. See *In re Estate of Clinger, supra*. We conclude that the district court's response to the jury's question did not amount to an abuse of discretion.

## VI. CONCLUSION

We affirm the district court's November 16, 2018, order of judgment accepting the verdict of the jury in favor of Lincoln Anesthesiology Group.

AFFIRMED.

- 14 -